## Case No. 6,360.

### HENFIELD'S CASE.

[Whart. St. Tr. 49.]

Circuit Court, D. Pennsylvania. 1793.

VIOLATION OF NEUTRALITY — LAW OF NATIONS—
TREATY—INDICTMENT—JURISDICTION OF
FEDERAL COURTS.

[1. Under the constitution of the United States, treaties with foreign nations comprise a portion of the public and supreme law of the land, and a violation of such treaty by a citizen of the United States may be punished in the federal courts by indictment.]

[2. The participation by the citizens of a neutral state in an attack by one belligerent power upon another is an offense against the law of nations, and may be punished as such by such neutral state.]

[3. Though there may have been no exercise of the power conferred upon congress by the constitution "to define and punish offenses against the law of nations," the federal judiciary has jurisdiction of an offense against the law of nations. and may proceed to punish the offender according to the forms of the common law; and it seems that the federal courts have common-law cognizance of offenses against the sovereignty of the United States.]

A charge delivered by the Honourable JOHN JAY, Esquire, Chief Justice of the United States, to the grand jury impannelled for the court of the United States, holden for the Middle circuit in the district of Virginia, at the capitol in the city of Richmond, on the 22d day of May, 1793.[1]

---

[1] This prosecution, which has been referred to frequently in the subsequent reports as the earliest case on the subject of the common law jurisdiction of the federal courts, and which was considered of so much importance by General Washington, as to justify a special meet-

Gentlemen of the Grand Jury: That citizens and nations should [so] use their own as not to injure others, is an ancient and excellent maxim; and is one of those plain precepts of common justice, which it is the interest of all, and the duty of each to obey, and that not only in the use they may make of their property, but also of their liberty, their power and other blessings of every kind.

To restrain men from violating the rights of society and of one another; and impartially to give security and protection to all, are among the most important objects of a free government. I say a free government, because in those that are not free, these objects being in certain respects secondary to others are less regarded, and less perfectly provided for. Where the conduct of the citizens is regulated by the laws made by themselves and for their common benefit, and ex-

ecuted by men deriving authority from, and responsible to them, the most regular and exact obedience to those laws is to be expected, required and rendered. By their constitution and laws, the people of the United States have expressed their will, and their will so expressed, must sway and rule supreme in our republic. It is in obedience to their will, and in pursuance of their authority, that this court is now to dispense their justice in this district; and they have made it your duty, gentlemen, to inquire whether any and what infractions of their laws have been committed in this district, or on the seas, by persons in or belonging to it. Proceed, therefore, to inquire accordingly, and to present such as either have, or shall come to your knowledge. That you may perceive more clearly the extent and objects of your inquiries, it may be proper to observe, that the laws of the United States admit of be-

ing of congress, and by Mr. Jefferson as to require a distinct explanation to the British government, is now for the first time reported. The charges of Chief Justice Jay and Judge Wilson, it is true, were printed by the government for the purpose of explaining abroad the position of the United States, but they have never yet been presented to the professional eye. Fortunately, however, among the papers of the late Mr. Rawle, who, as district attorney, conducted the prosecution; and those of Mr. Duponceau, who, with Mr. Sergeant and Mr. Ingersoll, were counsel for the defence, the editor has been enabled to discover notes which give an almost complete report of the case. The causes which led to it are best given by the following letters, which were obtained from the same source, and which are now for the first time published:

### Mr. Hammond to Mr. Jefferson.

The undersigned, his Britannic Majesty's Minister Plenipotentiary to the United States of America, has the honour of informing the Secretary of State, that he has received intelligence from his Majesty's Consul, at Charleston, South Carolina, that two privateers have been fitted out from that port under French commissions. They carry six small guns, and are navigated by forty or fifty men, who are, for the most part, citizens of the United States. One of these privateers left the harbour of Charleston on the 18th ult., and the other was on the 22d ready to depart.

The undersigned does not deem it necessary to enter into any reasoning upon these facts, as he conceives them to be breaches of that neutrality which the United States profess to observe, and direct contraventions of the proclamation which the president issued upon the 22d of last month. Under this impression, he doubts not that the executive government of the United States, will pursue such measures as to its wisdom may appear the best calculated for repressing such practices in future, and for restoring to their rightful owners any captures which these particular privateers may attempt to bring into any of the ports of the United States.                         Geo. Hammond.

Philadelphia, 8th May, 1793.
The Secretary of State.

Norfolk, May 5, 1793.

Sir: We have taken the liberty, considering it a duty, to give you information of two schooner boats, cruizing off our capes, as privateers, under French commissions, who are daily chasing vessels bound in and out, to the great prejudice of our trade, and contrary to the

law of nations to be chasing and boarding vessels within our territories. One of these vessels is called the Sans Culotte, and commanded by a Mr. Farre, the other called the Eagle; they are about the size of the largest pilot boats, and rigged as they are, mounting four carriage guns each, and fitted from Charleston. By reference to Captain Tucker's report, you will find how the Sans Culotte is manned; and from report of negro Caesar, the pilot, the Eagle has but one Frenchman on board her, the others Americans and Englishmen. One of these vessels belonged to Mr. Hooper, of Cambridge, in Maryland. Mr. Hooper is gone with Captain Tucker's vessel to that place, where his father lives, and Captain Tucker says, he understood she was to be laid up in some creek thereabouts. From the circumstances of erasing the name out of her stern, it appears as if some fraud intended. We are, with the greatest respect, &c.,
                              Thos. Newton, Jr.
                              Wm. Lindsay.

Captain Lindsay, of the schooner Greyhound, in twenty-three days from Jamaica, reports that he arrived here the 4th inst. That on the day before, about half past 11 o'clock, a. m., he fell in with the pilot boat Ranger, of Hampton, belonging to Mr. Latimer, who hailed him and asked what vessel he commanded, to which he replied, the Greyhound of Norfolk, (Captain Lindsay having erased the name of the port he belonged to, and substituted Norfolk,) and added, that he was from St. Eustatius, upon which Mr. Latimer gave information to a small schooner privateer, at not more than twenty-four yards from them, and not a half mile from Cape Henry: by this deception, Captain Lindsay supposes, he escaped being taken.

Captain Tucker, of the schooner Eunice of New Providence, reports that he was, on the 29th last month, taken by a privateer schooner, called the Sans Culotte, commanded by Captain Farre, in the latitude 36, in 27 fathom water. That after being in possession of the privateer, the name of his schooner was erased from the stern, and a Mr. Hooper, of Cambridge, in the state of Maryland, was put on board as prize master, and he understood she was to be carried there and laid up in some creek, and that Mr. Hooper was to go to Philadelphia on some business. That whilst he was prisoner, both the privateer and the prize came into Hampton Road, and lay in Hawkin's Hole part of two days and two nights, and then sailed out on a cruise. He says that a Major-General, of New England, was on board the privateer, and acted as a marine officer, and a lieutenant in the absence of Mr. Hooper.

Mr. Hooper owned the schooner Eagle, and

ing classed ·under three heads of descriptions. 1st. All treaties made under the authority of the United States. 2d. The laws of nations. 3dly. The constitution, and statutes of the United States.

Treaties between independent nations, are contracts or bargains which derive all their force and obligation from mutual consent and agreement; and consequently, when once fairly made and properly concluded, cannot be altered or annulled by one of the parties, without the consent and concurrence of the other. Wide is the difference between treaties and statutes—we may negotiate and make contracts with other nations, but we can neither legislate for them, nor they for us; we may repeal or alter our statutes, but no nation can have authority to vacate or modify treaties at discretion. Treaties, therefore, necessarily become the supreme law of the land, and so they are very properly de-

plied from this to Georgia and Charleston as a packet. She was fitted originally from Cambridge. From every circumstance, Captain Tucker was of opinion, they would take vessels in the Bay of Chesapeake, as they lay along-side one all night, but she proved to be an American vessel.

### Mr. Jefferson to Mr. Rawle, Enclosing the Above.

Philadelphia, May 15, 1793.

Sir: By the enclosed papers, you will perceive, there is reason to believe that certain citizens of the United States, have engaged in committing depredations on the property and commerce of some of the nations at peace with the United States. I have it in charge to express to you the desire of the government, that you would take such measures for apprehending and prosecuting them as shall be according to law. I am not able to point out to you the individuals against whom suggestions have been made, but take the liberty of referring you to Mr. Deblois and Mr. Sharpe Delany, who may give you information on the subject. I am, with great esteem, sir, your most obedient and most humble servant,        Th. Jefferson. Mr. Rawle.

### Mr. Rawle to Mr. Baker.

Sir: I have received information that a citizen of the United States, named Gideon Henfield, late of Salem, Massachusetts, has arrived at this port in the quality of an officer of a privateer, lately fitted out in Charleston, So. Carolina, on board a British vessel, taken as prize by the said privateer.

As I have received orders to prosecute, in every instance, those who commit breaches of the neutrality, declared to exist on the part of the United States, during the present war between the European powers, it is my duty to request, that you will be pleased to summon Mr. Lewis Deblois to appear before you, and if he verifies the above information upon oath, to issue your warrant for apprehending the said Gideon Henfield, in order that he may be dealt with according to law.
Yours, &c.,                          W. Rawle.
17 May, 1793.

The following paper was certified from the department of state to be used on the trial:

Marine Francaise.—Liberté, Egalité.—Au nom de la République Francaise.

Le Conseil Exécutif provisoire de la République Francaise permet, par les présentes, à

clared to be by the sixth article of the constitution. Whenever doubts and questions arise relative to the validity, operation or construction of treaties, or of any articles in them, those doubts and questions must be settled according to the maxims and principles of the laws of nations applicable to the case. The peace, prosperity, and reputation of the United States, will always greatly depend on their fidelity to their engagements; and every virtuous citizen (for every citizen is a party to them) will concur in observing and executing them with honour and good faith; and that, whether they be made with nations respectable and important, or with nations weak and inconsiderable, our obligation to keep our faith results from our having pledged it, and not from the character or description of the state or people, to whom, neither impunity nor the right of retaliation can sanctify perfidy; for although

—— de faire armer et équipper en guerre un —— nommé le —— du port de —— tonneaux, ou environ, actuellement au port de ——, avec tel nombre de canons, boulets, et telle quantité de poudres, plombs, et autres munitions de guerre et vivres qu'il jugera nécessaire pour le mettre en état de courir sur les pirates, forbans, gens sans aveu, et généralement sur tous les ennemis de la République Francaise, en quelque lieu qu'il pourra les rencontrer, de les prendre et amener prisonniers avec leurs navires, armes, et autres objets dont ils seront saisis, à la charge, par ledit —— de se conformer aux Ordonnances de la Marine, aux Lois décrétées par les Représentans du Peuple Francais, et notamment à l'article IV. de la Loi du 31 Janvier, concernant le nombre d'hommes devant former son équipage, de faire enregistrer les présentes Lettres au Bureau des Classes du lieu de son départ, d'y déposer un rôle, signé et certifié du lui, contenant les noms et surnoms, âge, lieu de naissance et demeure des gens de son équipage, et à son retour, de faire son rapport pardevant l'Officier chargé de l'Administration des lasses, de ce qui se sera passé pendant son Voyage.

Le Conseil Exécutif provisoire requiert tous Peuples, amis et allies de la République Francaise et leurs agens, de donner audit —— toute assistance, passage et retraite en leurs ports avec sondit vaisseau et les prises qu'il aura pu faire, offrant d'en user de même en pareilles circonstances. Mande et ordonne aux Commandans des Bâtimens de l'Etat, de laisser librement passer ledit —— avec son vaisseau et ceux qu'il aura pu prendre sur l'ennemi, et de lui donner secours et assistance.

Ne pourront, les présentes, servir que pour —— mois seulement, à compter de la date de leur enregistrement.

En foi de quoi le Conseil Exécutif provisoire de la République, a fait signer les présentes Lettres par le Ministre de la Marine, et y a fait apposer le sceau de la République.
Donné à Paris le —— jour du mois d —— mil sept cent —— l'an —— de la République Francaise.
            Nul. (Signé) Monyes, (L. S.)
                Par le Ministre de la Marine.
Pour servir remodel.
    (Signé.) Cottrau.

Department of State, to wit: I hereby certify, that the aforegoing is one of the blank forms of commissions, issued by the French Republic, communicated to me officially by the Minister of France. In testimony whereof, I have caused my seal of office to be hereto affixed. Given under my hand, this first day of June, 1793.                          Th. Jefferson.

perfidy may deserve chastisement, yet it can never merit imitation.

2. As to the laws of nations—they are those laws by which nations are bound to regulate their conduct towards each other, both in peace and war. Providence has been pleased to place the United States among the nations of the earth, and therefore, all those duties, as well as rights, which spring from the relation of nation to nation, have devolved upon us. We are with other nations, tenants in common of the sea—it is a highway for all, and all are bound to exercise that common right, and use that common highway in the manner which the laws of nations and treaties require. On this occasion, it is proper to observe to you, gentlemen, that various circumstances and considerations now unite in urging the people of the United States to be particularly exact and circumspect in observing the obligation of treaties, and the laws of nations, which, as has been already remarked, form a very important part of the laws of our nation. I allude to the facts and injunctions specified in the president's late proclamation; it is in these words: "Whereas, it appears that a state of war exists between Austria, Prussia, Sardinia, Great Britain, and the United Netherlands of the one part, and France of the other, and the duty and interest of the United States, require that they should with sincerity and good faith, adopt and pursue a° conduct friendly and impartial towards the belligerent powers: I have, therefore, thought fit by these presents, to declare the disposition of the United States to observe the conduct aforesaid towards these powers respectively, and to exhort and warn the citizens of the United States, carefully to avoid all acts and proceedings whatsoever, which may in any manner tend to contravene such disposition. I do hereby make known, that whosoever of the citizens of the United States, shall render himself liable to punishment or forfeiture, under the law of nations, by committing, aiding, or abetting hostilities against any of the said powers, or by carrying to them those articles which are deemed contraband, by the modern usage of nations, will not receive the protection of the United States against such punishment or forfeiture; and further, that I have given instructions to those officers to whom it belongs, to cause prosecutions to be instituted against all persons who shall within the cognizance of the courts of the United States, violate the law of nations, with respect to the powers at war, or any of them."

By this proclamation, authentic and official information is given to the citizens of the United States:—That war actually exists between the nations mentioned in it: That they are to observe a conduct friendly and impartial towards the belligerent powers: That offenders will not be protected, but on the contrary, prosecuted and punished. The law of nations, considers those as neutral nations "who take no part in the war, remaining friends to both parties, and not favouring the arms of one to the detriment of the other;" and it declares that a "nation, desirous safely to enjoy the conveniences of neutrality, is in all things to show an exact impartiality between the parties at war; for should he, when under no obligation, favour one to the detriment of the other, he cannot complain of being treated as an adherent and confederate of his enemy, of which no nation would be the dupe if able to resent it." The proclamation is exactly consistent with and declaratory of the conduct enjoined by the law of nations. It is worthy of remark that we are at peace with all these belligerent powers not only negatively in having war with none of them, but also in a more positive and particular sense by treaties with four of them.

By the first article of our treaty with France it is stipulated that "there shall be a firm, inviolable and universal peace, and true and sincere friendship between his Most Christian Majesty, his heirs and successors, and the United States; and between the countries, islands, cities and towns situate under the jurisdiction of his Most Christian Majesty and of the United States, and the people and inhabitants of every degree, without exception of persons or places." By the first article of our treaty with the United Netherlands, it is stipulated that "there shall be a firm, inviolable and universal peace, and sincere friendship between their High Mightinesses, the Lords and States General of the United Netherlands and the United States of America, and between the subjects and inhabitants of the said parties, and between the countries, islands and places situate under the jurisdiction of the said United Netherlands and the United States of America, their subjects and inhabitants of every degree, without exception of persons or places." The definitive treaty of peace with Great Britain begins with great solemnity, in the words following: "In the name of the most holy and undivided Trinity." By the seventh article of this treaty it is stipulated that "there shall be a firm and perpetual peace between his Britannic Majesty and the United States, and between the subjects of the one and the citizens of the other." By the first article of our treaty with Prussia it is stipulated that "there shall be a firm, inviolable and universal peace and sincere friendship between his Majesty, the King of Prussia, his heirs, successors and subjects on the one part, and the United States of America and their citizens on the other, without exception of persons or places."

By the laws of nations, the United States, as a neutral power, are bound to observe the line of conduct indicated by the proclamation towards all the belligerent powers, and that although we may have no treaties with them. But with respect to France, the United Netherlands, Great Britain and Prussia, the be-

fore-mentioned articles in our treaties with them, create additional obligations, to wit: all those obligations which result from express compact and from national faith, mutually, explicitly and solemnly pledged. Surely no engagements can be more wise and virtuous than those whose direct object is to maintain peace and to preserve large portions of the human race from the complicated evils incident to war. While the people of other nations do no violence or injustice to our citizens, it would certainly be criminal and wicked in our citizens, for the sake of plunder, to do violence and injustice to any of them. The president, therefore, has with great propriety declared "that the duty and interest of the United States require that they should, with sincerity and good faith, adopt and pursue a conduct friendly and impartial towards the belligerent powers." A celebrated writer on the law of nations very justly observes that "as nature has given to man the right of using force only when it becomes necessary for their defence, and the preservation of their rights, the inference is manifest that since the establishment of political societies, a right so dangerous in its exercise no longer remains with private persons, except in those kind of rencontres, where society cannot protect or defend them. In the bosom of society, public authority decides all differences of the citizens, represses violence and checks the impulse of revenge. It woud be too dangerous to give every citizen the liberty of doing himself justice against foreigners, as every individual of a nation might involve it in a war, and how could peace be preserved between nations if it was in the power of every man to disturb it? A right of so great moment, the right of judging whether a nation has a real cause of complaint, whether its case allows of using force, and having recourse to arms; whether prudence admits, and whether the welfare of the state demands it; this right," he says, "can only belong to the body of the nation, or to the sovereign its representative. It is doubtless one of those without which there can be no salutary government." It is on these and similar principles that whoever shall render himself liable to punishment or forfeiture, under the law of nations, by committing, aiding or abetting hostilities forbidden by his country, ought to lose the protection of his country against such punishment or forfeiture. But this is not all, it is not sufficient that a nation should only withdraw its protection from such offenders, it ought also to prosecute and punish them. The same writer very justly remarks that "the nation or sovereign ought not to suffer the citizens to do any injury to the subjects of another state, much less to offend the state itself; and that not only because no sovereign ought to permit those who are under his command to violate the precepts of the law of nature which forbids all injuries, but also because nations ought to respect each other, to ab-

stain from all abuse, from all injury, and, in a word, from everything that may be of prejudice to others. If a sovereign who might keep his subjects within the rules of justice and peace, suffers them to injure a foreign nation, either in its body or its members, he does no less injury to that nation than if he injured them himself. In short, the safety of the state and that of human society require this attention from every sovereign. If you let loose the reins of your subjects against foreign nations, these will behave in the same manner to you, and instead of that friendly intercourse which nature has established between all men we should see nothing but one nation robbing another." The respect which every nation owes to itself imposes a duty on its government to cause all its laws to be respected and obeyed, and that not only by its proper citizens, but also by those strangers who may visit and occasionally reside within its territories. There is no principle better established than that all strangers admitted into a country, are, during their residence, subject to the laws of it; and if they violate the laws they are to be punished according to the laws; the design of pains and penalties being to render the laws respected and to maintain order and safety. Hence, it follows that the subjects of belligerent powers are bound, while in this country, to respect the neutrality of it, and are punishable in common with our own citizens for violations of it, within the limits and jurisdiction of the United States. It is to be remembered, that every nation is, and ought to be, perfectly and absolutely sovereign within its own dominions, to the entire exclusion of all foreign power, interference and jurisdiction, whether attempted by a foreign prince, or by his subjects, with or without his order. "It is a manifest consequence of the liberty and independence of nations, that all of them have a right to be governed as they think proper, and that none have the least authority to interfere in the government of another state. Of all the rights that can belong to a nation, sovereignty is doubtless the most precious, and that which others ought the most scrupulously to respect, if they would not do it an injury." These are general principles—the laws to which they apply are numerous, and need not be particularized in detail—on the present occasion, it will be sufficient to lead your attention to one or two, which will serve to explain the reason and extent of these principles. "The right of levying soldiers is a sovereign right belonging only to the nation. No foreign power can lawfully exercise it without permission, nor without previous permission can such attempts be otherwise regarded, than as improper interferences with the sovereignty of the country; on this head the law of nations is explicit. It declares, That the right of levying soldiers belongs solely to the nation: this important power is the appendage of the sovereign; it

makes a part of the supreme prerogative. No person is to enlist soldiers in a foreign country without the permission of the sovereign. They who undertake to enlist soldiers in a foreign country, without the sovereign's permission, or alienate the subjects of another, violate one of the most sacred rights both of the prince and the state; it is a crime punished with great severity in every policied state. Foreign recruiters are hanged immediately, and very justly, as it is not to be presumed, that their sovereign ordered them to commit the crime; and if he did, they ought not to have obeyed his order, their sovereign having no right to command what is contrary to the law of nature; usually they who have practised seduction only are severely punished. But if it appears that they acted by order of the sovereign, such a proceeding in a foreign sovereign is justly considered as an injury, and as a sufficient cause for declaring war against him, unless he condescends to make suitable reparation."

From the observations which have been made, this conclusion appears to result, viz.: That the United States are in a state of neutrality relative to all the powers at war, and that it is their duty, their interest, and their disposition to maintain it: that, therefore, they who commit, aid, or abet hostilities against these powers, or either of them, offend against the laws of the United States, and ought to be punished; and consequently, that it is your duty, gentlemen, to inquire into and present all such of these offences, as you shall find to have been committed within this district. What acts amount to committing or aiding, or abetting hostilities, must be determined by the laws and approved practice of nations, and by the treaties and other laws of the United States relative to such cases. I doubt the expediency of anticipating such cases, and endeavouring now to distinguish acts which do, from others which do not, involve the criminality in question. Singular cases may arise.—If, in the course of your inquiries, you should experience difficulties, the attorney general and, if necessary, the court, will assist you.

Before I dismiss this subject, it cannot be improper to remark, that a state of neutrality leaves us perfectly at liberty to exercise every humane, benevolent, and friendly office towards the powers at war and their subjects; and to continue our usual commerce with them, excepting only those offices and that kind of trade, which may be designed and calculated to give to one party a military preponderancy to the detriment of the others. While we contemplate with anxiety and regret the desolation and distress which a war so general and so inflamed will probably spread over more than one country, let us with becoming gratitude wisely estimate and cherish the peace, liberty, and safety with which the Divine Providence has been pleased so liberally to bless us. By the favour of Heaven, we

this day enjoy a degree of prosperity unknown to any other nation in the world—let it be among our enjoyments to render our happiness instrumental in alleviating the misfortunes to which many have already been, and more will yet be, reduced by those national contentions—in a word—let us be faithful to all—kind to all—but let us also be just to ourselves.

The people of the United States have exhibited too many proofs of virtue and intelligence, to leave room to doubt their continuing to be so guided by their usual integrity and good sense—but in every nation individuals will always be found who, impelled by avarice or ambition, or by both, will not hesitate to gratify those passions at the expense of the blood and tears even of those who are free from blame. Such men are to be restrained only by fear of punishment. There is, however, another consideration connected with the subject which merits much attention. It is natural in all contests, even for the best men, to take sides, and wish success to one party in preference to the other; our wishes and partialities becoming inflamed by opposition, often cause indiscretions, and lead us to say and to do things that had better have been omitted. It is not certain that the irritability of the belligerent powers, combined with some indiscretions on our part, will not involve us in war with some of them. Prudence directs us to look forward to such an event, and to endeavour not only to avert, but also to be prepared for it. Among our preparations, there can be none more important than union and harmony among ourselves. It is very desirable, that such an event do not find us divided into parties, and particularly into parties in favour of either foreign nation. Should this be the case, our situation would be dangerous as well as disgraceful. While blessed with union in sentiments and measures relative to national objects, we shall have little fear; and, therefore, it is sincerely to be wished that our citizens will cheerfully and punctually do their duty to every other nation, but at the same time carefully avoid becoming partisans of any of them. There is not a history of any nation which does not record the mischiefs they experienced from such parties, and they rarely present us with an instance of a nation being conquered and subjugated, without the detestable aid of its own degenerate or deluded citizens. Nothing is more certain than, that if such parties should arise among the people, they will find their way into every department of government, and carry distrust and discord with them—dark and dreary would then be the prospect before us, and we should in vain look for the speedy return of those happy days, when the government was peacefully, wisely and prosperously administered, under the care and auspices of a patriot, in whom the United States have by repeated unanimity.

in their suffrages, manifested a degree of confidence, no less reputable to their own wisdom and virtue than to his. But, if neither integrity nor prudence on our part should prove sufficient to shield us from war, we may then meet it with fortitude, and a firm dependence on the Divine protection; whenever it shall become impossible to preserve peace by avoiding offences, it will be our duty to refuse to purchase it by sacrifices and humiliations, unworthy of a free and magnanimous people, either to demand or submit to. The subject presented by the proclamation, appeared to me to be highly interesting, and I thought it useful to treat it with much plainness, as well as latitude. I was aware that I was treading on delicate ground; but as the path of my duty led over it, it was incumbent on me to proceed.

On the third branch of the laws of the United States, viz: their constitution and statutes, I shall be concise. Here, also, one great unerring principle, viz: the will of the people, will take the lead. The people of the United States, being by the grace and favour of Heaven, free, sovereign and independent, had a right to choose the form of national government which they should judge most conducive to their happiness and safety. They have done so, and have ordained and established the one which is specified in their great and general compact or constitution—a compact deliberately formed, maturely considered, and solemnly adopted and ratified by them. There is not a word in it but what is employed to express the will of the people; and what friend of his country, and the liberties of it, will say that the will of the people is not to be observed, respected and obeyed? To this general compact every citizen is a party, and consequently, every citizen is bound by it. To oppose the operation of this constitution and of the government established by it, would be to violate the sovereignty of the people, and would justly merit reprehension and punishment. The statutes of the United States, constitutionally made, derive their obligation from the same source, and must bind accordingly. Happy would it be for mankind, and greatly would it promote the cause of liberty and the equal rights of men, if the free and popular government which from time to time may result, should be so constructed, so balanced, so organized and administered, as to be evidently and eminently productive of a higher and more durable degree of happiness than any of the other forms. It is not sufficient to tell men by a bill of rights, that they are free, that they have equal rights, and that they are entitled to be protected in them; men will not believe they are really free, while they experience oppression—they do not think their title to equal rights realized until they enjoy them; nor will they esteem that a good government, whatever may be its name, which does not uniformly, impartially and effectually protect them. The more free the people are, the more strong and efficient ought their government to be, and for this plain reason, that it is a more arduous task to make and keep up the fences of law and justice about twenty rights than about five or six; and because it is more difficult to fence against and restrain men who are unfettered, than men who are in yokes and chains. Being a free people, we are governed only by laws, and those of our own making—these laws are rules for regulating the conduct of individuals, and are established according to, and in pursuance of that contract which each citizen has made with the rest, and all with each. He is not a good citizen who violates his contract with society; and when society execute their laws, they do no more than what is necessary to constrain individuals to perform that contract, on the due operation and observance of which the common good and welfare of the community depend; for the object of it is to secure to every man what belongs to him, as a member of the nation; and by increasing the common stock of property, to augment the value of his share in it. Most essentially, therefore, is it the duty and interest of us all, that the laws be observed, and irresistibly executed. I might now proceed to call your attention to certain statutes which merit particular attention, and it would not be difficult to place them in points of view, in which their importance to the public would appear in strong lights— but having already detained you so long, and these subjects not being new to you, I will forbear enlarging on them on the present occasion. The manner in which you are to fulfil the duties now incumbent on you, is specified in the oath you have taken. The experience of ages commends the institution of grand juries; it has merited and received constant encomiums, and I trust, gentlemen, that your conduct on this and similar occasions, will afford new proofs of its utility and excellence.[2]

Charge of Judge WILSON, as president of a special court of the United States, for the Middle circuit and Pennsylvania district, holden at the court house, in the city of Philadelphia, on the 22d day of July, 1793, to the grand jury of said court:

Gentlemen of the Grand Jury: It is my duty to explain to you the very important occasion on which this court is specially convened, and to state the points of law not less important to the application of which that occasion gives rise.

To the judge of the Pennsylvania district information was given on oath, that certain

---

[2] This charge, though not delivered to the particular grand jury by whom the bill against Henfield was found, was prepared for the purpose of settling the law generally as applying to the class of offenders, of whom Henfield was one, and in this light it is here introduced.

citizens of the United States had acted in several capacities as officers on board an armed schooner, said to be commissioned by France as a cruiser or private ship-of-war; and with others on board that schooner did capture and make prize of several ships or vessels belonging to his Britannic Majesty, and otherwise assist in an hostile manner in annoying the commerce of the subjects of his said Britannic Majesty, who is at peace with the United States, contrary to their duty as citizens of the United States. On receiving this information the judge issued his warrant for apprehending the persons against whom complaint was made, that they might answer for their doings in the premises, and be dealt with according to law. That legal proceedings in this and some other business might be had speedily, one of the judges of the supreme court of the United States and the judge of the Pennsylvania district issued their warrant, directing that on this day, and at this place a special session of the circuit court for this district should be held, and that grand and traverse jurors should be summoned to attend it. As the court however is authorized generally to try criminal causes, if any other crimes or offences cognizable in it be laid before you or are in your knowledge, it is your duty to present them. But to the business to which you have been particularly called, and to articles intimately connected with it, I shall confine the remarks which I have to give you in charge. I introduce them by noticing, with pleasure, the near and endearing relation between the freedom and the dignity of man. In governments unfavourable to both, treaties and the construction of treaties are numbered among the arcana imperii, the secrets of empire, enclosed within the cabinets of princes and secluded from the judgment of the citizens, whose lives and fortunes however they chiefly affect; under our national constitution, treaties compose a portion of the public and supreme law of the land, and for their construction and enforcement are brought openly before the tribunals of our country. Of those tribunals juries form an essential part; under the construction given by those juries, treaties will suffer neither in their importance nor in their sanctity.

"Sapientissima res tempus"—says the profound Bacon in one of his aphorisms, concerning the augmentation of the sciences—time is the wisest of things. If the qualities of the parent may be expected in the offspring, the common law, one of the noblest births of time, may be pronounced the wisest of laws. This expression, says a great lawyer (Finch, Law, 74, 75), is not new and strange, or barbarous and peculiar to England. It is the proper term for other laws also. Euripides mentions the common laws of Greece; and Plato defines common law to be that, which being taken up by the common consent of a country, is called law. In another place the same illustrious philosopher names it the golden and sacred rule of reason which we call "Common Law." To the common law of England, however, the phrase is often peculiarly appropriated. Of this common law, the antiquity is unquestionably very high. But the precise era of its commencement, and the several springs from which it originally flowed, it is very difficult, if not altogether impracticable to trace. One reason for this may be drawn from the very nature of a system of common law. As it is accommodated to the situation and circumstances of the people; and as that situation and those circumstances insensibly change, a proportioned variation of laws insensibly takes place; and it becomes impossible to ascertain the period when this change began, or to mark the different steps of its progress.

It might be amusing and instructive, but at this time it would be improper, to sketch the general outlines of the system through the government of the Saxons down to the conquest of the Normans. Suffice it to observe, and the observation is important, that the common law, as now received in America, bears, in its principles and in many of its more minute particulars, a stronger and a fairer resemblance to the common law as it was improved under the former, than to that law as it was disfigured under the latter. The accommodating principle of a system of common law will adjust its improvement to every grade and species of improvement (Fortes, 257, 264), in consequence of practice, commerce, observation, study or refinement. As the science of legislation is the most noble, so it is the most slow and difficult of sciences. Willing to avail itself of experience, it receives additional improvement from every new situation to which it arrives; and in this manner attains, in the progress of time, higher and higher degrees of perfection, resulting from the accumulated wisdom of ages. On some occasions the spirit of a system of common law is accommodating; but on others its temper is decided and firm. The means are varied according to times and circumstances, but its great ends are kept steadily and constantly in view. How effectually has the spirit of liberty animated this system in all the vicissitudes, revolutions and dangers to which it has been exposed! In matters of a civil nature the common law works itself pure by rules drawn from the fountain of justice. In matters of a political nature it works itself pure by rules drawn from the fountain of freedom. It was this spirit which dictated the frequent and formidable demands on the Norman princes, for the complete restoration of the Saxon jurisprudence. It was this spirit which, in Magna Charta, manifested a strict regard to the rights of the Commons as well as those of the Peers. It was this spirit which ex-

tracted sweetness from all the bitter contentions between the rival houses of York and Lancaster. It was this spirit which preserved England from the haughtiness of the Tudors and from the tyranny of the Stuarts. It was this spirit which rescued the states of America from the oppressive claims and from all the mighty efforts made to enforce the oppressive claims of a British parliament. The common law, says my Lord Coke (Calvin's Case, 7 Coke, 1), is a social system of jurisprudence. She receives other laws and systems into a friendly correspondence; and associates to herself those who can give her information, or advice, or assistance. Does a contract bear a peculiar reference to the local laws of any particular foreign country? By the local laws of that foreign country the common law will direct the contract to be interpreted and adjusted. Does a mercantile question occur? She determines it by the law of merchants. Does a question arise before her, which properly ought to be resolved by the law of nations? By that law she will decide the question. For that law in its full extent is adopted by her. The infractions of that law form a part of her code of criminal jurisprudence. 4 Bl. Comm. 67.

In our present business, gentlemen, this great subject deserves a full and a pointed illustration. Such as it is in my power, on a short notice, to give, I now proceed to lay before you. The law of nature when applied to states or political societies, receives a new name, that of the law of nations. But though it receives a new appellation, it retains unimpaired its qualities and its powers. The law of nations as well as the law of nature, is of obligation indispensable. The law of nations as well as the law of nature is of "origin divine." There are, it is true, laws of nations—perhaps it is to be wished that they were designated by another name—there are laws of nations which are founded altogether on human consent; of this kind are national treaties. But the municipal laws of a state are not more distinct from the law of nature than those consentual laws of nations are in their source and power distinct from the law of nations properly so called. Indeed those consentual laws of nations are not less controlled by the law of nations properly so called, than municipal laws are controlled by the law of nature. The law of nations is the law of states and sovereigns. On states and sovereigns it is obligatory in the same manner and for the same reasons, as the law of nature is obligatory upon individuals. Universal and unchangeable is the obligation of both. How great, how important, how interesting are these truths! They announce to a free people how solemn their duties are! If a practical knowledge and a just sense of those duties were diffused universally among the citizens, how beneficial and lasting would the fruits be!

It seems to have been thought that the law of nations respects and regulates their conduct only in their intercourse with each other. A very important branch of this law containing the duties which a nation owes to itself, has in a great measure escaped attention. Of a state, as well as of an individual, self-preservation is a primary duty. To love and to deserve an honest fame is another duty of a state as well as of a man. To a state as well as to a man, reputation is a valuable and an agreeable possession. It represses hostility and secures esteem. In transactions with other nations, the dignity of a state should never be permitted to suffer the smallest diminution. Need it be mentioned here, that happiness is the centre to which states as well as men are universally attracted! To consult its own happiness, therefore, is the duty of a nation. When men have formed themselves into a political society, they may reciprocally enter into particular engagements and contract new obligations in favour of the community or of its members. But they cannot, by this union, discharge themselves from any duties which they previously owed to those who form a part of the political association. Under all the obligations due to the universal society of the human race, the citizens of a state still continue. To this universal society it is a duty that each nation should contribute to the welfare, the perfection and the happiness of the others. If so, the first degree of this duty is to do no injury. Among states as well as among men, justice is a sacred law. This sacred law prohibits one state from exciting disturbances in another, from depriving it of its natural advantages, from calumniating its reputation, from seducing its citizens, from debauching the attachment of its allies, from fomenting or encouraging the hatred of its enemies. Vatt. Law Nat. 127. But nations are not only prohibited from doing evil, they are also commanded to do good to one another. On states as well as individuals the duties of humanity are strictly incumbent; what each is obliged to perform for others, from others it is entitled to receive. Hence the advantage as well as the duty of humanity. It may be uncommon, but it is unquestionably just to say, that nations ought to love one another. From the pure source of benevolence the offices of humanity ought to flow. By a nation these enlarged and elevated virtues should be cultivated with peculiar assiduity and ardour; of an individual, however generous his disposition may be, the sphere of exertion is frequently narrow; but of a nation this sphere is comparatively boundless. By exhibiting a glorious example in her constitution, in her laws, and in the administration of her constitution and laws, she may diffuse instruction, she may diffuse reformation, she may diffuse happiness over the whole terrestrial globe. These

maxims of national law, though the sacred precepts of nature, and of nature's God, have been too often unknown and unacknowledged by nations. Even where they have been known and acknowledged, their calm still voice has been drowned by the clamours of ambition and by the thunder of war.

Is it then unnecessary or improper here to say, peace should be deemed the basis of the happiness of nations, "peace on earth!" This is a patriotic as well as an angelic wish. But with war and rumours of war our ears in this imperfect state of things are still assailed. Into this unnatural state ought a nation to suffer herself to be drawn without her own act, or the act of him or them, to whom for this purpose she has delegated her power? Into this unnatural state should a nation suffer herself to be drawn by the unauthorized, nay by the unlicensed conduct of any of her citizens? These, gentlemen, are questions to which you are now called to give the closest and deepest attention. That a citizen, who in our state of neutrality, and without the authority of the nation, takes an hostile part with either of the belligerent powers, violates thereby his duty, and the laws of his country, is a position so plain as to require no proof, and to be scarcely susceptible of a denial.

Under the treaty of amity and commerce between the United States and France, it may be made a question, whether the privateers of that power have a right to "fit out their ships in our ports." This question arises from the twenty-second article of that treaty. "It shall not be lawful for any foreign privateers, not belonging to the subjects of his Most Christian Majesty, nor citizens of the United States, who have commissions from any other prince or state in enmity with either nation to fit out their ships in the ports of either the one or the other of the aforesaid parties." It may be alleged, that this prohibition against fitting the ships of privateers belonging to any other nation implies a permission to fit the ships of privateers belonging to France.— But this inference cannot justly be drawn. If, by a promise made to one person, I restrain myself from lending money to any others, I am not surely by that restraining engagement, obliged to lend my money to him. It may be convenient, it may be necessary for me to reserve its application exclusively for my own purposes. In the same manner, by a stipulation, that in a war between France and Britain, we will not lend the use of our ports to the privateers of the latter, we are by no means obliged to lend it to those of the former. It may be convenient, it may be necessary for us to refuse it to both. True it is, that by the treaty we are obliged to refuse it to Britain, and this to one of the parties was probably an important object. But it re-

mains in our option whether we will or will not grant it to France. Both the nations which made this treaty, might have the most unexceptionable, nay, the most commendable motives for reserving to themselves this option. France, particularly, might have the strongest reasons for refusing to bind herself, at all events, to permit even the United States to fit out in her ports privateers against any nation however united to her by compact, with which the United States might be at war. This option, perhaps with France a favourite one, each of the parties to the treaty reserved the power of making. This option our nation, or its representatives for that purpose, have not yet made. This option private citizens are certainly unauthorized and unwarranted to make. Private citizens, therefore, assisting in a business of this kind, offend the law, and for their offences are amenable to the justice of the nation. If you know of any such, it is your duty to present them here.

In some instances citizens may be accountable for the conduct of their nation. In other instances the nation may be accountable for the conduct of its citizens. It is impossible indeed that even in the best regulated state, the government should be able to superintend the whole behaviour of all the citizens and to restrain them within the precise limits of duty and obedience (Vatt. Law Nat. 144); it would be unjust, therefore, immediately to impute to the nation the faults or offences which its members may commit. In every state, disorderly citizens are unhappily to be found. Let such be held responsible, when they can be rendered amenable for the consequences of their crimes and disorders. If the offended nation have the criminal in its power, it may without difficulty punish him, and oblige him to make satisfaction. Vatt. Law Nat. 145. When the offending citizen escapes into his own country, his nation should oblige him to repair the damage, if reparation can be made, or should punish him according to the measure of his offence. Vatt. Law Nat. 75; Burrows, 1480; 4 Bl. Comm. 68, 69. If the nation refuse to do either, it renders itself in some measure an accomplice in the guilt, and becomes responsible for the injury. Vatt. Law Nat. 145. To what does this responsibility lead? To reprisal certainly (Vatt. Law Nat. 251); and if so, probably to war (Id. 2; 4 Bl. Comm. 68, 69). And should the fortunes or the lives of millions be placed in either of those predicaments by the conduct of one citizen, or of a few citizens? Vatt. Law Nat. 2, 89. Humanity and reason say no. The constitution of the United States says no. Id. 2, 89. By that constitution, many great powers are vested in the first executive magistrate: others are vested in him, "by and with the advice and consent of the senate." But neither he, nor he and they in conjunc-

tion, can lift up the sword of the United States. Congress alone have power to declare war, and to "grant letters of marque and reprisal." Who indeed should have the power to declare war but these, as the immediate representatives of those who must furnish the blood and treasure upon which war depends? With regard to this very interesting power, the constitution of the United States renews the principles known and practised in England before the conquest. This indeed may be reckoned one of the chief differences between the government of the Saxons and that of the Normans. In the former, the power of peace and war was invariably possessed by the Wittenagemote (Millar, Eng. Const. 305), and was regarded as inseparable from the allodial condition of its members. In the latter, it was transferred to the king; and this branch of the feudal system, which was accommodated perhaps to the depredations and internal commotions prevalent in that rude period, has remained in subsequent ages, when from a total change of manners, the circumstances by which it was recommended, have no longer any existence. There is, by the way, a pleasure in reflecting on such important renovations of the venerable Saxon government; and in discovering that our national constitution is rendered illustrious by the antiquity, as well as by the excellence of some of its leading principles.

The principle now under our view was urged as one reason why this constitution should be adopted by Pennsylvania: if urged with propriety then, it may be urged with propriety now. For what was then adopted, ought now to be supported. "This system will not hurry us into war. It is calculated to guard against it. It will not be in the power of a single man or a single body of men to involve us in such distress. For the important power of declaring war is vested in the legislature at large.—This declaration must be made with the concurrence of the house of representatives. From this circumstance we may draw a certain conclusion, that nothing but our national interest will draw us into a war." I cannot forbear on this occasion, the pleasure of mentioning to you the sentiments of the great and benevolent man, whose works I have already quoted (Mr. Neckar), who has addressed this country in language important and applicable, in the strictest manner, to its situation, and to the present subject. Speaking of war, and the great caution that all nations ought to use, in order to avoid its calamities—"And you, rising nation," says he, "whom generous efforts have freed from the yoke of Europe! Let the universe be struck with still greater reverence at the sight of the privileges you have acquired, by seeing you continually employed for the public felicity. Do not offer it as a sacrifice at the unsettled shrine of political ideas, and of the deceitful combinations of warlike ambition: avoid, or at least delay, participating in the passions of our hemisphere; make your own advantage of the knowledge which experience alone has given to our old age, and preserve for a long term, the simplicity of childhood; in short, honour human nature by showing, that when left to its own feelings, it is still capable of those virtues that maintain public order, and of that prudence which ensures public tranquillity." Deb. Conv. Pa. 434. On this great subject of peace and war, the voice of all France is responsive to the language of our national constitution. "When the interesting question was before her national assembly, its deliberations, we are told, were watched with anxiety by countless thousands. All Paris was in agitation, and when the decree was pronounced, that the lives and fortunes of twenty-five millions of men should not be at the disposal of a single individual, there was a shout of acclamation raised, which reached from the garden of the Tuileries to the extremest province of France." Can we believe, for a moment, that this generous nation would wish to bereave us of a security, which they themselves so highly and so justly prize?

On July 27, 1793, the following indictment was returned by the grand jury:

At a special circuit court of the United States for the Middle circuit and the Pennsylvania district, holden at the city of Philadelphia, in the district aforesaid, on the twenty-second day of July, in the year of our Lord one thousand seven hundred and ninety-three, the grand inquest for the United States, in the Middle circuit of the said United States, and in the district of Pennsylvania, upon their respective oaths and affirmations, present: That, whereas, an open and notoriously public war for a long time hath been, and yet is, by sea and by land, had, carried on, and prosecuted, between the Republic of France and the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and the States General of the United Netherlands and their subjects, during all which time a treaty of amity and commerce was, and still is, in force between the said States General of the United Netherlands and the United States of America, whereby it is, among other things, provided that there shall be a firm, inviolable, and universal peace and sincere friendship between their High Mightinesses the Lords the said States General of the United Netherlands and the United States of America, and between the subjects and inhabitants of the said parties, and between the countries, islands, cities, and places situated under the jurisdiction of the said United Netherlands and the said United States of America, their subjects and inhabitants of every degree, without exception of persons or places: And, whereas, by the constitution ordained

and established for the said United States of America it is, among other things, provided that all treaties made, or which shall be made under the authority of the said United States, shall be the supreme law of the land; and, whereas, at the time of the said war, by virtue of a certain commission and certain letters of marque and reprisal granted by the Republic of France, a certain ship-of-war called the Citizen Genet was, among others, set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens, to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods, and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, and the King and people of Great Britain, and especially of the United Netherlands and the subjects thereof, and against them to wage war on the high seas, and within the jurisdiction of this court,—Gideon Henfield, late of the district aforesaid, yeoman, being an inhabitant of the said United States of America, well knowing the premises, and intending and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm, inviolable and universal peace and sincere friendship aforesaid between the said United Netherlands and the said United States of America, on the fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, with force and arms, on the high seas, and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship between the said United Netherlands and the said United States of America; and that he, the said Gideon Henfield, so being an inhabitant of the said United States of America, on the same day and year aforesaid, on the high seas aforesaid, and within the jurisdiction of this court, and being a prize-master on board the said ship-of-war, unlawfully and maliciously sailed and cruised to several maritime places within the jurisdiction aforesaid, by force and arms to take the ships, goods, and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and especially of the said States General of the United Netherlands, to the evil example of all others in like case offending, against the treaty aforesaid, against the laws of the said United States in such case made and provided, against the said constitution of the United States of America, and against the peace and dignity of the said United States.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present:—That, whereas, an open and notoriously public war for a long time hath been, and yet is, by sea and by land, had, carried on, and prosecuted, between the Republic of France and the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and the States General of the United Netherlands and their subjects, during all which time a treaty of amity and commerce was, and still is, in force between the said King of Prussia and the United States of America, whereby it is, among other things, provided that there shall be a firm, inviolable, and universal peace and sincere friendship between his Majesty the King of Prussia, his heirs, successors, and subjects, on the one part, and the said United States of America and their citizens on the other, without exception of persons or places: And, whereas, by the constitution ordained and established for the said United States of America it is, among other things, provided that all treaties made, or which shall be made, under the authority of the said United States, shall be the supreme law of the land; and, whereas, at the time of the said war, by virtue of a certain commission and certain letters of marque and reprisal granted by the Republic of France, a certain ship-of-war, called the Citizen Genet, was, among others, set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens, to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods, and moneys of the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, the States General of the United Netherlands and their subjects, and especially of the King and people of Prussia, and against them to wage war on the high seas, and within the jurisdiction of this court,—Gideon Henfield, late of the district aforesaid, yeoman, being an inhabitant of the said United States of America, well knowing the premises, and intending and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship aforesaid, between his said Majesty the King of Prussia and the said United States of America, on the fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, with force and arms, on the high seas, and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship between his said Majesty the King of Prussia and the said United States of America; and that he, the said Gideon Henfield, so being an inhabitant of the said United States of America, on the same day and year aforesaid, on the high seas aforesaid, and within the jurisdiction of this court, and being a prize-master on board of the said ship-of-war, unlawfully and maliciously sailed and cruised to

several maritime places within the jurisdiction aforesaid, by force and arms to take the ships, goods, and moneys of the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, the States General of the United Netherlands and their subjects, and especially of the King and people of Prussia, to the evil example of all others in like case offending against the laws of the said United States in such case made and provided, against the treaty aforesaid, against the said constitution of the United States of America, and against the peace and dignity of the said United States.

And the said grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present:—That, whereas an open and notoriously public war for a long time hath been, and yet is, by sea and by land, had, carried on, and prosecuted between the Republic of France and the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and the States General of the United Netherlands and their subjects, during all which time a definitive treaty of peace and commerce was, and still is, in force between the said King of Great Britain and the said United States, wherein and whereby it is provided that there shall be a firm and perpetual peace between the said King of Great Britain and the said United States, and between the subjects of the one and the citizens of the other, wherefore all hostilities should from thenceforth cease, by virtue whereof the said United States became, and still are neutral in relation to the said King and people of Great Britain and the said Republic of France: And, whereas, by the constitution ordained and established for the said United States of America, it is, among other things, provided that all treaties made, or which shall be made under the authority of the said United States, shall be the supreme law of the land; and, whereas, at the time of the said war, by virtue of a certain commission and certain letters of marque and reprisal, granted by the Republic of France, a certain ship-of-war, called the Citizen Genet, was, among others, set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens, to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods, and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the States General of the United Netherlands and their subjects, and especially of the King and people of Great Britain, and against them to wage war, on the high seas, and within the jurisdiction of this court,— Gideon Henfield, late of the district aforesaid, yeoman, being an inhabitant of the said United States, well knowing the prem-

ises, and intending and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm and perpetual peace between the said King of Great Britain and the said United States of America, and to disturb the said neutrality so, as aforesaid, existing on the part of the said United States in relation to the said King and people of Great Britain and the said Republic of France, on the fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, with force and arms, on the high seas, and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm and perpetual peace between the said King of Great Britain and the said United States of America; and that he, the said Gideon Henfield, so being an inhabitant of the said United States of America, on the same day and year aforesaid, on the high seas aforesaid, and within the jurisdiction of this court, and being a prize-master on board of the said ship-of-war, unlawfully and maliciously sailed and cruised to several maritime places within the jurisdiction aforesaid, by force and arms, to take the ships, goods, and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the States General of the United Netherlands, and especially of the King and people of Great Britain, and then and there, in and on board of the said ship-of-war, with divers others, whose names to the grand inquest aforesaid are yet unknown, with force and arms, unlawfully and maliciously, in prosecution of the said unlawful and malicious intent and purpose, attack, seize, and take a certain ship or vessel, called the William, belonging to a subject or subjects of his said Britannic Majesty, against the definitive treaty aforesaid, against the said constitution of the United States of America, and against the peace and dignity of the said United States.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present:—That, whereas, the said United States of America, on the said fifth day of May, in the year aforesaid, were, and now are, by treaties of peace and amity, allied unto and at peace with the States General and the people of the United Netherlands, and the King and people of Prussia, and also at peace with the King and people of Great Britain and the said States General and the people of the United Netherlands, the said King and people of Prussia, and the said King and people of Great Britain, on the said fifth day of May aforesaid, in the year aforesaid, were at war with the Republic of France, the said Gideon Henfield then and there, being a citizen and inhabitant of the United States, unlawfully and maliciously contriving and intending to disturb and destroy the peace of the said United States, and to involve the said United States

in a war with the said States General and people of the United Netherlands, and with the said King and people of Prussia, and the said King and people of Great Britain, on the said fifth day of May, in the year aforesaid, on the high seas, and within the jurisdiction of the said court, in and on board a certain vessel, armed and fitted out for warlike purposes, and commanded by a certain Peter Johannen, having a commission from the Republic of France to attack, seize, and take prisoners all the enemies of the said Republic of France, with their ships, arms, and other articles of property, did, with force and arms, unlawfully and maliciously, and contrary to his duty as a citizen of the said United States of America, attack, seize, and take as a prize a certain ship called the William, then and there belonging to certain subjects of the said King of Great Britain, to the evil example of all others in like case offending, in violation of the laws of nations, against the laws of the United States in such case made and provided, and against the constitution of the United States, and against the peace and dignity of the said United States.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present:—That, whereas, on the said fifth day of May, in the year aforesaid, a treaty of peace, amity, and commerce sub-sisted, and was in full force, between the States General and the people of the United Netherlands and the said United States of America, between the King and people of Prussia and the said United States of America, and also a treaty of peace between the King and people of Great Britain and the said United States of America,—the said Gideon Henfield, late of the district aforesaid, yeoman, then and there, being a citizen and inhabitant of the said United States, well knowing the premises, did, on the said fifth day of May, on the high seas, and within the jurisdiction of this court, unlawfully, violently, and injuriously combine and con-federate with divers others whose names to the grand inquest aforesaid are yet unknown, to attack, seize, capture, burn and destroy the vessels, goods, and merchandise, of the States General and the citizens and subjects of the said United Netherlands, and the said King and people of Prussia, and the said King and people of Great Britain, and to assault, imprison, and kill the said citizens and subjects of the said United Netherlands, of the said kingdom of Prussia, and of the said kingdom of Great Britain; in violation of the laws of nations and the constitution and laws of the said United States of America, and against the peace and dignity of the said United States of America.

And the grand inquest aforesaid, upon the respective oaths and affirmations aforesaid, further present:—That, whereas, on the said —— day of ——, in the year aforesaid, a treaty of peace, amity, or commerce subsist-ed, and was in full force, between the States General and the people of the United Neth-erlands and the said United States of Amer-ica, between the King and people of Prussia and the said United States of America, and also a treaty of peace between the King and people of Great Britain and the said United States of America,—the said Gideon Henfield, late of the district aforesaid, yeoman, then and there, being a citizen and inhabitant of the said United States, well knowing the premises, did, on the said fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, on the high seas, and within the jurisdiction of this court, un-lawfully, violently, and injuriously combine and confederate with divers others whose names to the grand inquest aforesaid are yet unknown, to attack, seize, capture, burn, and destroy the vessels, goods, and merchandises of the States General and the citizens and subjects of the said United Netherlands, and the said King and people of Prussia, and the said King and people of Great Britain, and to assault, imprison, and kill the said citizens and subjects of the said United Netherlands, of the said kingdom of Prussia, and of the said kingdom of Great Britain, and in prose-cution of the said wicked and unlawful at-tempt, the said Gideon Henfield afterwards, on the said day and year aforesaid, on the high seas, and within the jurisdiction of the said court, in and on board a certain vessel armed and fitted out for warlike purposes, and commanded by a certain Peter Johan-nen, having a commission from the Republic of France to attack, seize, and take prisoners all the enemies of the said Republic of France, with their ships, arms, and other ar-ticles of property, did, with force and arms, unlawfully and maliciously, and contrary to his duty as a citizen of the said United States. attack, seize, and take as a prize, a certain ship called the William, then and. there belonging to certain subjects of the said King of Great Britain, in violation of the laws of nations, to the evil example of all others in like case offending, against the laws and constitution of the United States. and against the peace and dignity of the said United States.

Whereas, an open and notoriously public war for a long time hath been and yet is, by sea and by land, had, carried on, and prose-cuted between the Republic of France and the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and the States General of the United Netherlands and their subjects, during all which time a treaty of amity and commerce was and still is in force between the said States General of the United Neth-erlands and the United States of America, whereby it is among other things provided, that there shall be a firm, inviolable, and universal peace and sincere friendship be-tween their High Mightinesses the Lords, the

said States General of the United Netherlands, and the United States of America, and between the subjects and inhabitants of the said parties, and between the countries, islands, cities, and places situated under the jurisdiction of the said United Netherlands and the said United States of America, their subjects and inhabitants of every degree, without exception of persons or places: And whereas, by the constitution, ordained and established for the said United States of America, it is among other things provided, that all treaties made, or which shall be made under the authority of the said United States, shall be the supreme law of the land: And whereas, at the time of the said war, by virtue of a certain commission and certain letters of marque and reprisal, granted by the Republic of France, a certain ship of war, called the Citizen Genet, was among others set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods, and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, and the King and people of Great Britain, and especially of the United Netherlands and the subjects thereof, and against them to wage war in the river Delaware, and within the jurisdiction of this court, Gideon Henfield, late of the district aforesaid, yeoman, being an inhabitant of the said United States of America, well knowing the premises, and intending and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship aforesaid, between the said United Netherlands and the said United States of America, on the fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, there with force and arms, on the high seas, to wit, in the river Delaware, and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship between the said United Netherlands and the said United States of America; and that he, the said Gideon Henfield, so being an inhabitant of the said United States of America, on the same day and year aforesaid, in the river Delaware, and within the jurisdiction of this court, and being a prize-master on board of the said ship-of-war, unlawfully and maliciously sailed and cruised to several maritime places within the jurisdiction aforesaid, by force and arms to take the ships, goods, and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and especially of the said States General of the United Netherlands, to the evil example of all others, in like case offending against the laws of the United States in such case made and provided, against the treaty aforesaid, against the said constitution of the United States of America, and against the peace and dignity of the said United States.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present, That whereas, an open and notoriously public war for a long time hath been and yet is, by sea and by land, had, carried on, and prosecuted between the Republic of France, and the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and the States General of the United Netherlands and their subjects, during all which time a treaty of amity and commerce was and is still in force between the said King of Prussia and the United States of America, whereby it is among other things provided, that there shall be a firm, inviolable, and universal peace and sincere friendship between his Majesty the King of Prussia, his heirs, successors and subjects, on the one part, and the said United States of America, and their citizens, on the other, without exception of persons or places: And whereas, by the constitution, ordained and established for the said United States of America, it is among other things provided, that all treaties made, or which shall be made under the authority of the said United States, shall be the supreme law of the land: And whereas, at the time of the said war, by virtue of a certain commission and certain letters of marque and reprisal, granted by the Republic of France, a certain ship of war, called the Citizen Genet, was among others set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods, and moneys of the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, the States General of the United Netherlands and their subjects, and especially of the King and people of Prussia, and against them to wage war in the river Delaware, and within the jurisdiction of this court, Gideon Henfield, late of the district aforesaid, yeoman, being an inhabitant of the said United States of America, well knowing the premises, and intending and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship aforesaid, between his said Majesty the King of Prussia and the said United States of America, on the fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, with force and arms, in the river Delaware and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship, between his said Maj-

esty the King of Prussia and the said United States of America; and that he, the said Gideon Henfield, so being an inhabitant of the said United States of America, on the same day and year aforesaid, in the river Delaware, and within the jurisdiction of this court, and being a prize-master on board the said ship of war, unlawfully and maliciously sailed and cruised to several maritime places within the jurisdiction aforesaid, by force and arms to take the ships, goods, and moneys of the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, the States General of the United Netherlands and their subjects, and especially of the King and people of Prussia, to the evil example of all others, in like case offending against the treaty aforesaid, and against the laws of the said United States in such case made and provided, against the said constitution of the United States of America, and against the peace and dignity of the said United States.

And the said grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present:—That, whereas, an open and notoriously public war for a long time hath been, and yet is, by sea and by land, had, carried on, and prosecuted, between the Republic of France, and the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the King and people of Great Britain, and the States General of the United Netherlands and their subjects, during all which time a definitive treaty of peace was, and still is, in force between the said King of Great Britain, and the said United States, wherein and whereby it is provided, that there shall be a firm and perpetual peace. between the said King of Great Britain, and the said United States, and between the subjects of the one, and the citizens of the other, wherefore, all hostilities shall from thenceforth cease: And, whereas, by the constitution ordained and established for the said United States of America, it is among other things, provided, that all treaties made, or which shall be made, under the authority of the said United States, shall be the supreme law of the land, and by reason thereof, the said United States became, and now are neutral in relation to the said King and people of Great Britain, and the said Republic of France: And, whereas, at the time of the said war, by virtue of a certain commission, and certain letters of marque and reprisal granted by the Republic of France, a certain ship-of-war, called the Citizen Genet, was, among others, set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens, to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods and moneys of the King and people of Prussia, the King and people of Sardinia, the King of Hungary his subjects and people, the States General of

the United Netherlands and their subjects, and especially of the King and people of Great Britain, and against them to wage war in the river Delaware, and within the jurisdiction of this court,—Gideon Henfield, late of the district aforesaid, yeoman, being an inhabitant of the said United States, well knowing the premises, and intending and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm and perpetual peace, between the said King of Great Britain, and the said United States of America, and to disturb the said neutrality so as aforesaid existing, on the part of the United States, in relation to the said King and people of Great Britain, and said Republic of France, on the fifth day of May, in the year of our Lord one thousand seven hundred and ninety-three, with force and arms, in the river Delaware, and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm and perpetual peace between the said King of Great Britain and the said United States of America; and that he, the said Gideon Henfield, so being an inhabitant of the said United States of America, on the same day and year aforesaid, in the river Delaware, and within the jurisdiction of this court, and being a prize-master on board the said ship-of-war, unlawfully and maliciously sailed and cruised to several maritime places within the jurisdiction aforesaid, by force and arms to take the ships, goods and moneys of the King and people of Sardinia, the King and people of Prussia, the King of Hungary his subjects and people, the States General of the United Netherlands, and, especially, of the King and people of Great Britain, and then and there, in and on board of the said ship-of-war, with divers others, whose names to the grand inquest, aforesaid, are yet unknown, with force and arms unlawfully and maliciously, in prosecution of the said unlawful and malicious intent and purpose, attack, seize and take, a certain ship or vessel, called the William, belonging to a subject or subjects of his said Britannic Majesty, to the evil example of all others in like case offending, against the definitive treaty aforesaid, against the laws of the United States, in such cases made and provided, against the said constitution of the United States of America, and against the peace and dignity of the said United States.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present: That, whereas, the said United States of America, on the said fifth day of May, in the year aforesaid, were, and now are, by treaties of peace and amity allied unto, and at peace with the States General, and the people of the United Netherlands, and the King and people of Prussia, and also at peace with the King and people of Great Britain, and the said States General, and the people of the United Netherlands, the said King and people of Prussia, and the

said King and people of Great Britain, on the said fifth day of May aforesaid, in the year aforesaid, were at war with the Republic of France, the said Gideon Henfield, then and there being a citizen and inhabitant of the United States, unlawfully and maliciously contriving and intending to disturb and destroy the peace of the said United States, and to involve the said United States in a war with the said States General, and the people of the United Netherlands, and with the said King and people of Prussia, and the said King and people of Great Britain, on the said fifth day of May aforesaid, in the year aforesaid, in the river Delaware, and within the jurisdiction of the said court, in and on board of a certain vessel, armed and fitted out for warlike purposes, and commanded by a certain Peter Johannen, having a commission from the Republic of France, to attack, seize, and take prisoners all the enemies of the said Republic of France, with their ships, arms, and other articles of property, did with force and arms unlawfully and maliciously, and contrary to his duty as a citizen of the said United States of America, attack, seize, and take as a prize a certain ship, called the William ——, then and there belonging to certain subjects of the said King of Great Britain, in violation of the laws of nations, against the laws and constitution of the United States, and against the peace and dignity of the said United States.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present: That, whereas, on the said fifth day of May, in the year aforesaid, a treaty of peace, amity and commerce subsisted and was in full force between the said States General and the people of the United Netherlands and the said United States of America, between the King and people of Prussia and the said United States of America, and also a treaty of peace between the King and people of Great Britain and the said United States of America, the said Gideon Henfield, late of the district aforesaid, yeoman, then and there being a citizen and inhabitant of the said United States, and knowing the premises did, on the said fifth day of May, in the year aforesaid, in the river Delaware and within the jurisdiction of this court, unlawfully, violently and injuriously combine and confederate with divers others, whose names to the grand inquest aforesaid are yet unknown, to attack, seize, capture, burn and destroy the vessels, goods and merchandise of the States General and the citizens and subjects of the said United Netherlands and the said King and people of Prussia, and the said King and people of Great Britain, and to assault, imprison and kill the said citizens and subjects of the said United Netherlands, of the said kingdom or Prussia, and of the said kingdom of Great Britain, in violation of the laws of nations and the constitution and laws of the said

United States of America and against the peace and dignity of the said United States of America.

And the grand inquest aforesaid, upon their respective oaths and affirmations aforesaid, further present: That, whereas, on the said fifth day of May, in the year aforesaid, a treaty of peace, amity or commerce subsisted and was in full force between the States General and the people of the United Netherlands and the said United States of America, between the King and people of Prussia and the said United States of America, and also a treaty of peace between the King and people of Great Britain and the said United States of America, the said Gideon Henfield, late of the district aforesaid, yeoman, then and there being a citizen and inhabitant of the said United States, well knowing the premises did, on the said fifth day of May, in the year aforesaid, in the river Delaware and within the jurisdiction of this court, unlawfully, violently and injuriously combine and confederate with divers others, whose names to the grand inquest aforesaid are yet unknown, to attack, seize, capture, burn and destroy the vessels, goods and merchandise of the States General and the citizens and subjects of the said United Netherlands and the said King and people of Prussia and the said King and people of Great Britain, and to assault, imprison and kill the said citizens and subjects of the said United Netherlands, of the said kingdom of Prussia, and of the said kingdom of Great Britain, and in prosecution of the said wicked and unlawful attempt, the said Gideon Henfield afterwards, on the said —— day and year aforesaid, in the river Delaware and within the jurisdiction of the said court, in and on board a certain vessel armed and fitted out for warlike purposes and commanded by a certain Peter Johannen, having a commission from the Republic of France to attack, seize and take prisoners all the enemies of the said Republic of France, with their ships, arms and other articles of property, did, with force and arms, unlawfully and maliciously, and contrary to his duty as a citizen of the said United States attack, seize and take as a prize a certain ship called the William, then and there belonging to certain subjects of the said King of Great Britain, to the evil example of all others in the like case offending, in violation of the laws of nations, against the laws and constitution of the United States and against the peace and dignity of the said United States.[3]

W. Rawle,
Attorney of the United States in and for the Pennsylvania District.

Hilary Baker, Esq., sworn,
Lewis Deblois, Esq., sworn,
John Morgan, sworn,
James Bassett, sworn.

---

[3] Among Mr. Rawle's papers is the following draft of indictment, in the hardwriting of Mr.

It appeared in evidence that Gideon Henfield was a citizen of the United States and that his family resided in Salem, Massachusetts. Being a sea-faring man he had been absent from them some time, and about the 1st of May, 1793, being then at Charleston, South Carolina, and desirous of coming to Philadelphia, he applied to the master of a packet, who asked him more for his passage than he could afford to pay, whereupon he entered on board the Citizen Genet, a French privateer, commissioned by the French Republic and commanded by Pierre Johannen. Captain Johannen, it appeared, promised him the berth of prize-master on board the first prize they should capture, and the ship William, belonging to British subjects, having been captured about the 5th of May, he was put on board her as prize-master, with another person, and arrived in that capacity at Philadelphia. It appeared that on his examination before the magistrate, he protested himself an American, that as such he would die, and therefore could not be supposed likely to intend anything to her prejudice. He declared if he had known it to be contrary to the president's proclamation, or even the wishes of the president, for whom he had the greatest respect, he would not have entered on board. About a month afterwards, being before the same magistrate, he declared he had espoused the cause of France, that he now considered himself as a Frenchman, and meant to move his family within their dominions.

---

Randolph, with marginal corrections, apparently by Mr. Hamilton:

"For that, whereas, an open and notoriously public war for a long time hath been, and yet is, by sea and by land, had, carried on, and prosecuted between (here name the nations at war) —during all which time a treaty of amity and commerce was, and still is in force between the said States General of the United Netherlands and the United States of America, whereby it is, among other things, provided that there shall be a firm, inviolable, and universal peace and sincere friendship between their High Mightinesses the Lords the said States General of the United Netherlands and the U. S. of America, and between the subjects and inhabitants of the said parties, and between the countries, islands, cities. and places situated under the jurisdiction of the said U. Nthds. and the said U. S. of America, their subjects and inhabitants of every degree, without exception of persons or places: And. whereas, by the constitution ordained and established for the said U. S. of A., it is, among other things, provided that all treaties made, or which shall be made, under the authority of the U. S., shall be the supreme law of the land: And, whereas, at the time of the said war, by virtue of a certain commission and certain letters of marque and reprisal, granted by the Republic of France, a certain ship-of-war, called the Citizen Genet, was, among others, set out and equipped, of which a citizen of the said Republic of France was commander, with several other French citizens, to the number of fifty persons, in a warlike manner, to take and destroy the ships, goods, and moneys (name the nations). and especially of the U. Nethds. and the subjects thereof, and against them to wage war on the high seas, and within the jurisdiction of this court. A. B., &c. (with the additions) being an inhabitant of the said U. S. of A. well knowing the premises, and intending

Mr. Rawle, district attorney, with whom was Mr. Randolph, attorney general, made the following points:

1. Every member is accountable to society for those actions which may affect the interest of that society.

2. The United States being in perfect peace with all nations, and allied in friendly bonds with some, their national situation requires a perfect neutrality from every motive applicable to our common interest.

3. An aggression on the subjects of other nations done in an hostile manner and under colour of war is a violation of that neutrality.

4. If not under the colour of war it would be an act of piracy. But by the laws of nations if one of the belligerent powers should capture a neutral subject fighting under a commission from the other belligerent powers he could not punish him as a pirate, but must treat him as an enemy, and it would be a good cause of declaring war against the nation to which he belonged; and if treated as an enemy without just cause it is the duty of the nation to which he belongs to interfere in his behalf; and thus arises another cause of war. Hence the act of the individual is an injury to the nation. and the right of punishment follows the existence of the injury.

5. The right of peace and war is always vested in the government. In the United States, but congress alone possesses it. By the formation of the society every individual

and contriving, and with all his strength purposing to interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship, as aforesaid, between the said U. Nethds. and the said U. S. of A. on the ―――― day of ――――, &c., with force and arms, on the high seas, and within the jurisdiction of this court, unlawfully and maliciously did interrupt, destroy, and break the said firm, inviolable, and universal peace and sincere friendship, between the said U. N. and the said U. S. of A., and that he, the said A. B., so being an inhabitant of the said U. S of A. on the same day and year aforesaid, on the high seas aforesaid, and within the jurisdiction of this court, and being a ―――― on board of the said ―――― of war, unlawfully and maliciously sailed and cruised to several maritime places within the jurisdiction aforesaid, by force and arms to take the ships, goods, and moneys (name the nations), and especially of the said States General of the U. Nethds., against the treaty aforesaid, against the said constitution of the U. S. of A., and against the peace, &c.

"A like count as to Prussia, substituting the words of the treaty with that nation, observing the words of the treaty minutely.

"A count as to England. substituting the words of the treaty with England, and charging an actual taking, observing the words of the treaty minutely.

"The two counts, with the alteration suggested by Mr. Lewis, appear advisable, as does the third general one recommended by him.

"I confess. that I would repeat all those counts as within the river Delaware.

"I would lay, too, a general trespass on the high seas, without reference to allies or treaties.

"It may, perhaps, be found advisable separately to indict under the 19th article of the Dutch treaty."

has consented to its being thus exclusively deposited for the general benefit. No individual, therefore, can assume the exercise of this right. For if one could do it one thousand might, and while the government declared peace the tragedy of war would be acted in its defiance.

6. If one individual has a right to associate with the subjects of one of the belligerent powers, another individual has an equal right to do the same with the other belligerent power; thus the citizens of the neutral nation might be fighting with each other. Under this unhappy prospect, the national character and existence of America are lost; and instead of being members of a great nation, we become a band of miserable Algerines.

7. The facts here show: (1) That Henfield is a citizen and inhabitant, though afterwards he takes counsel and alters his note. (2) That he entered on board the privateer, Citizen Genet, at Charleston. (3) That she was a commissioned vessel. (4) That he aided and assisted in taking the prize, and came in on board her as prize-master. The sufferings and character of Henfield can have no operation here: it is a point for the court, and no justification. France is at war with Austria, Spain, Portugal, and Sardinia, with whom we are at peace; with Great Britain, with whom a treaty of peace exists; and with the United Netherlands and Prussia, with whom there is peace, amity, and commerce. To the first two we are related as having neither given nor received offence. But the want of a treaty with them will not justify the individual in his aggression on them. With Great Britain is a treaty of peace, by article 7 of which it is provided that there shall be a firm and perpetual peace between his Britannic Majesty and the United States, and the subjects of the one and the citizens of the other. With the United Netherlands and Prussia, treaties not only of peace but of mutual friendship and liberal commerce. The commission under which the proceedings of defendant took place is generally against all these powers, though actual aggression is charged as to one only. That one is one with whom we have a treaty of peace, which is the supreme law of the land, and this is the positive prohibitory law. Thus, an infraction of this kind, unless punished, becomes a good cause of war on the part of the offended nation. Vatt. Law Nat. bk. 4, § 52; Bynk. bk. 1, p. 178, c. 8. It is an offence against our own country, at common law, because the right of war is vested in the government only. Puff. Law Nat. bk. 8, c. 6, § 8; Vatt. Law Nat. bk. 3, § 4; Id. bk. 4, § 223. In a state of nature the right adhered to the individual. It is lost by joining society. The common welfare requires this position in its fullest extent, otherwise a few individuals, for avaricious purposes, might involve the nation in a war; otherwise, the members of the nation, taking opposite sides, might de-

stroy the nation in detail (Vatt. Law Nat. bk. 3, § 8); otherwise, the primary duty due from the citizen to the nation would remain unperformed while his labours and his life were devoted to the service of foreigners. Nor are these only the speculations of the closet. We see them carried into effect in England in affirmation of national common law, i. e. the law of nations. 4 Bl. Comm. 69. The English statute is not in force here, because the specific remedy for which alone it was made cannot be had, but the law which it aided, not introduced, is in force. The law of nations is part of the law of the land. 4 Bl. Comm. 66; [Respublica v. De Longchamps] 1 Dall. [1 U. S.] 111; C. L. 11b. This is an offence against the laws of nations. It is punishable by indictment on information as such. [Respublica v. De Longchamps] 1 Dall. [1 U. S.] 114, &c.; 3 Burrows, 1480. It is agreed that the laws of nations point out different methods of proceedings:—(1) By the belligerent power treating the offenders as pirates. (2) By negotiation, or the declaration of war. But the answer is that these are concurrent remedies.

True, that some writers say they may be treated as pirates, and certain, that they may be treated as enemies. But these do not preclude the national right of proceeding against the delinquents judicially. 3 Bl. Comm. 2, 3, 4, &c. So a man may defend himself against violence, but the assailant may be indicted. A man may peaceably retake his own property, but he may also have a replevin. A man may enter, &c., but he may have his ejectment. The same observations apply to negotiation. We may negotiate as well on national as on private concerns, but without prejudice to the judicial remedy. But it is the honour of free states that the judicial remedy is necessary. 4 Bl. Comm. 67. That the executive should be inadequate to sudden and unusual exertions of power is our pride and happiness; and that our courts should, with that impartial and unbiased dignity which characterizes their judicial investigations of truth, apply the law of nations to men, of which nations are composed, and substitute the scales of justice for the sword of war.

But it is said that there is a want of precedent for this prosecution. The first answer is, that it is demonstrated that the law of nations is part of the law of the land. The second answer is, that in numerous other instances, enumerated by Blackstone, the law of nations is enforced by the judiciary. In cases of this nature, we find provisions have been made by statute in affirmance of the law, providing more speedy and specific relief than the common course of the law will admit. Thus the 31 Hen. VI. c. 4, was passed, and then, 3 Jac. I. c. 4, which makes it felony to go out of the realm to serve a foreign prince without oath of allegiance. That an indictment will lie on the latter is un-

questionable. On the former, see 3 Bulst. 28—a case in point.

It is urged, also, that the right of emigration is natural to freemen. It is no crime to become a French subject, and being a French subject, the defendant may lawfully enlist in this command. The answer is, that when a man has fairly and deliberately emigrated—when he has renounced his own country, and has been received and domiciliated by the other—when all this has been done previously to the commission of the hostile act, and without a view to it, there is no offence in an act of this kind. But the power of emigrating, and the power of renouncing the original country, are widely different. To emigrate is declared to be, in most instances, lawful for a private citizen, in some it is dishonourable—as to leave a country under difficulties, as in a dangerous war, &c. But, at all events, if at the time the act was committed, the party was unquestionably a citizen, had not renounced his country, and was not domiciliated elsewhere, he cannot escape punishment by becoming a citizen afterwards. Still less, when as expressly stated and proved, he was then an inhabitant. Is not the defendant's family still at Massachusetts? Is he not still upon the roll of their citizens; were his family in want, would they not be entitled to public relief? Did he not declare that, as an American he would die? It is said, it is true, that without actual expatriation, a freeman, in a free country, may consistently with the law of nations enter as a volunteer. 2 Lee, 251. The answer is to be found in Vatt. Law Nat. lib. 3, § 13, in addition to what is already cited.

2. The principles of Lee are as questionable as those of Vattel are solid. It is prostrating the right of civil society, to support the right of man in a state of nature. The latter is destructive to civil society—which is instituted to prevent the pernicious effects of those rights. Grotius, whom he quotes, does not say so. Grotius treats simply of the right of emigrating, and there is not a syllable of the matter treated on by Lee in the whole section of Grotius. Grot. lib. 2, c. 5, § 24. But in the same section Grotius very justly says, that one ought not to go out of a state, when the interest of the state requires otherwise. And surely the interest of the state is affected by going out for these purposes. Lee himself excepts those states in which it was not allowable by the custom, as he terms it. That this is the case in England is in proof. And it has not been altered here. The bill of rights declares, emigration shall not be prohibited.

It is contended, however, that the act done —having been done on board the vessel—it is there French country, and the act there is lawful. The answer is, that in no respect is a foreign vessel a foreign country. Suppose the defendant had on board that vessel committed a private offence, the indictment lays it as having been done by a citizen—an inhabitant. There is really no technical difficulty. The evidence comes fully up to the case. The defendant was in Charleston; he there entered the vessel, and to argue that the instrument by which the offence is committed shall protect him from punishment, is an absurdity. By this the old doctrine of deodands is reversed; there the instrument partook of the offence; here the offender is to be incorporated into the innocence of the instrument. Let us suppose America engaged in war, and that one of her faithless children prefers the other party, joins an hostile detachment which has already invaded his own country, or enters on board a foreign privateer lying in our bay, and commits those acts, which in war are lawful, in peace, crimes. Does the right to emigrate, the right to choose his country, to renounce his former allegiance protect him here? It will be said that this is not a parallel case. What is the difference? (1) The offender in the latter case has a right to leave one country and become a citizen of another. (2) He has a right to disengage himself entirely from the obligations of duty and obedience to the first country. (3) The act of joining the other country, of itself, exempts him from those primary obligations. So far, the parallel is exact. To escape its effect, it may be asserted, that a man can never lift his hand against his native country. But, then, what becomes of all these rights? If the slavish doctrine of an unalienable allegiance is admitted, it totally destroys the right of emigration.

Thus after all this circuit we are let down where we began, viz: That the emigration from one country and the reception in another must be substantially and definitely effected before the acts of hostility. Let it not be said that this doctrine violates the rights of man. It is on the rights of man that it is established. The rights of man are the rights of all men in relation to each other, and when voluntarily assumed in society founded on principles of genuine freedom, they form a useful, benevolent, and endearing system, in which as much is received as is given. Perfect equality is one of those rights. We render ourselves equal when we all submit to the laws. That equality is destroyed if one man can set himself above them. That equality is destroyed if one man with impunity may involve three millions in war. With the honour of being the first in the eighteenth century to unfurl the standard of freedom we unite the glory of being the first in the records of man who deliberately composed a constitution of government, combining every noble, every useful, every rational, every patriotic object, and containing within itself the means of acquiring and securing them all. Of this the prominent effects strike the most careless eye. The world does not exhibit a fairer picture of fe-

licity, more useful industry, more wholesome laws, more public and private virtue, more genuine and uniform improvement, more to attract the admiration of the traveller and secure the affections of the citizen than the land we inhabit. Yet it is on such a country that inconsiderate and selfish men would pour the miseries of war. Is it not fair to ask them by what authority have you or I delegated to an individual the right of subjecting us to the pressure of heavy taxes, to the desolation of property, to the destruction of agriculture and of commerce, to the dangers of military service, in short, to the havoc and miseries of war? Has Pennsylvania, have the United States? No. Our excellent constitution has wisely vested this solemn, awful step in the collected wisdom and patriotism of the whole country. There the necessity of the war and the means of defence will be compared by men selected by their country and responsible to it, but not by men who would us in what they profess they will not share with us, and in the very act which draws on us the greatest political affliction renounce the very connexion which has alone rendered us liable for their conduct. Have the convention of France requested it? No. They have requested our neutrality. The French people who assisted us formerly did it under the sanction and approbation of their sovereign. Instead, however, of his having no power over them, as stated by the other side, the operation of most positive and powerful laws was suspended, with a view to that public assistance which afterwards took place. 2 Vatt. Law Nat. 235. The intention of France was soon known; she declared herself when she thought the time mature.

---

[4] The solicitude felt in the case by the officers of the government is illustrated by the following notes to Mr. Rawle during the progress of the trial:

(From Mr. Hamilton.)

Dear Sir: I send you all the books you sent me. There appears to me a passage important to Mr. Rawle—Questiones Juris Pub. lib. 1, chap. viii. p. 178.—I mean what relates to the people of Munster who made out of the territories of Spain incursions into those of Holland. It shows by an example that military expeditions out of the territory of a neutral power cannot rightfully be made by a power at war, and that if permitted the neutral nation is answerable. A fortiori, the means of such expeditions cannot be prepared in a neutral territory.

A.

Endorsed { Mr. Lewis    United States
          or             vs.
          Mr. Rawle.     Henfield. }

(From Mr. Randolph.)

E. Randolph, with best respects to Mr. Rawle:—The nineteenth article of the Dutch treaty was adverted to; and it was presumed that you would operate with it, if any of the crew were found to come within the description. The captain of the privateer seems, from your information, to be of doubtful character. May it not, therefore, be advisable to inquire, whether he be an American or foreign citizen, before you get into motion against him?
Sunday.

Mr. Duponceau, Mr. Ingersoll and Mr. Sergeant addressed the jury at great length; and insisted—

1. That the indictment did not include an offence at common law.

2. That if the president's proclamation created such an offence, the case before the court was committed before the proclamation was made.

3. That though the treaty with Morocco prohibited the enlisting of American citizens under such circumstances as the present, yet there was no such provision in the treaty with France, and hence the inference from its express introduction into the former treaty is that it was intentionally omitted from the latter.

4. That independently of these grounds, as there was no statute giving jurisdiction, the court could take no cognizance of the offence.

On the question under the laws of nations were cited, 6 Hume, Hist. Eng. 433; 1 Hutch. Hist. Mass. Bay, 251; 3 Vatt. Law Nat. 15; Bynk. 22d, c.; Syn. Gal. Rep. 94.[5]

---

Judge WILSON (with whom were Judge IREDELL and Judge PETERS) charged the jury as follows:

This is, gentlemen of the jury, a case of the first importance. Upon your verdict the interests of four millions of your fellow-citizens may be said to depend. But whatever be the consequence, it is your duty, it is our duty, to do only what is right.

(After stating the substance of the charges against the defendant, the learned judge proceeded:)

It has not been contended, on the present occasion, that the defendant has any peculiar exclusive right to take a part in the present war between the European powers, in relation to all whom the United States are in a state of peace and tranquillity. If he has no peculiar or exclusive right, it naturally follows, that what he may do every other citizen of the United States may also do. If one citizen of the United States may take part in the present war, ten thousand may. If they may take part on one side, they may take part on the other; and thus thousands of our fellow-citizens may associate themselves with different belligerent powers, destroying not only those with whom we have no hostility, but destroying each other. In such a case, can we expect peace among their friends who stay behind? And will not a civil war, with all its lamentable train of evil, be the natural effect? Yet what is right must be done, independent of the consequences, which

---

[5] Unfortunately for the profession the only notes the editor has been able to obtain of the argument for the defence are those taken at the time by Mr. Rawle. The newspapers, however, speak of the speeches of both Mr. Sergeant and Mr. Ingersoll as of great power; and in the Daily Advertiser of August 5, 1793, a communication appears, in which, by a critic of no mean abilities, Mr. Sergeant's speech is referred to as most efficient and unanswerable.

I have only stated, in order to lay before you the necessity of seriously considering the case entrusted to you before you decide upon it.

Two principal questions of fact have arisen, and require your determination. The first is, that the defendant, Gideon Henfield, has committed an act of hostility against the subjects of a power with whom the United States are at peace: this has been clearly established by the testimony. The second object of inquiry is, whether Gideon Henfield was at that time a citizen of the United States. This he explicitly acknowledged to Mr. Baker; and, if he declared true, it was at that time the least of his thoughts to expatriate himself.

The questions of law coming into joint consideration with the facts, it is the duty of the court to explain the law to the jury, and give it to them in direction. It is the joint and unanimous opinion of the court, that the United States, being in a state of neutrality relative to the present war, the acts of hostility committed by Gideon Henfield are an offence against this country, and punishable by its laws. It has been asked by his counsel, in their address to you, against what law has he offended? The answer is, against many and binding laws. As a citizen of the United States, he was bound to act no part which could injure the nation; he was bound to keep the peace in regard to all nations with whom we are at peace. This is the law of nations; not an ex post facto law, but a law that was in existence long before Gideon Henfield existed. There are, also, positive laws, existing previous to the offence committed, and expressly declared to be part of the supreme law of the land. The constitution of the United States has declared that all treaties made, or to be made, under the authority of the United States, shall be part of the supreme law of the land. I will state to you, gentlemen, so much of the several treaties in force between America and any of the powers at war with France, as applies to the present case. The first article of the treaty with the United Netherlands, declares that there shall be a firm, inviolable, and universal peace and sincere friendship between the States General of the United Netherlands and the United States of America, and between the subjects and inhabitants of the said parties. The seventh article of the definitive treaty of peace between the United States and Great Britain, declares that there shall be a firm and perpetual peace between his Britannic Majesty and the United States, and between the subjects of the one and the citizens of the other. And the first article of the treaty with Prussia declares that there shall be a firm, inviolable, and universal peace and sincere friendship between his Majesty the King of Prussia and his subjects, on the one part, and the United States of America and their citizens on the other. It may be observed, that the treaty would not be less sufficient in relation to the present question, if "subjects" and "citizens" had not been mentioned. These treaties were in the most public, the most notorious existence, before the act for which the prisoner is indicted was committed. The notoriety may, indeed, be said to have been greater than that of the general acts of congress; since, besides the same mode of publication, they are expressly referred to in the constitution. Much has been said on this occasion, by the defendant's counsel, in support of the natural right of emigration; but little of it is truly applicable to the present question. Emigration is, undoubtedly, one of the natural rights of man. Yet it does not follow from thence that every act inconsistent with the duty is inconsistent with the state of a citizen. Nothing is more inconsistent with the duty of a citizen than treason; but it is because he still continues a citizen that he is liable to punishment.[6]

---

[6] From the several charges in the text may be deduced three points:

(1) That the participation by the citizens of a neutral state in an attack by one belligerent power upon another, is an offence against the laws of nations, and may be punished as such by such neutral state.

(2) That though there has been no exercise of the power conferred upon congress by the constitution "to define and punish offences against the laws of nations," the federal judiciary has jurisdiction of an offence against the laws of nations, and may proceed to punish the offender according to the forms of the common law.

(3) That a violation by a citizen of the Union of a treaty with a foreign state, may be punished in the federal courts by indictment.

Perhaps to these may be added the much controverted position that the federal courts have common law cognizance of offences against the sovereignty of the United States.

The first point can give but little trouble. It is fully supported by the citations given by Chief Justice Jay from the civilians; and the late accomplished and lamented Mr. Wheaton, in his Commentary on the Law of Nations, lays down the same doctrine though without reference to this case. Wheat. Law Nat. 471.

The second and third points, however, so far as they involve the third, have been the subject of frequent discussion, and of a variety of adjudication which on a former occasion was traced as follows:

"The inclination of authority, as has been already noticed, is, that the federal courts have no common law jurisdiction whatever in criminal cases. See 4 Tuck. Bl. App. 10. In the first case in which the question was mooted—U. S. v. Ravara [Case No. 16,122]—it was argued that the offence committed was not an offence at common law, nor made so by any positive law of the United States, but it was not urged that, unless defined by statute, it could not be punished; and the court found the defendant guilty, the offence being held indictable at common law. In a case arising shortly afterwards—U. S. v. Worrall [Case No. 16,766]—Mr. Dallas, counsel for the defendant, argued that, by the 12th article of the amendment to the constitution, 'the powers not delegated to the United States, nor prohibited to the states, are reserved to the states respectively, or to the people.' In relation to crimes and punishments, the objects of the delegated powers of the United States, he urged, are enumerated and fixed. Every power is matter of definite and positive grant, and the very powers that are granted cannot take effect until they are exercised through the medium of the law. Congress has, undoubted-

After some other observations, explanatory of the legal principles which had been agitated in the course of the trial, the judge concluded by remarking, that the jury, in a general verdict, must decide both law and fact, but that this did not authorize them to decide it as they pleased; they were as much

bound to decide by law as the judges: the responsibility was equal upon both.

The jury retired about nine on Saturday evening, and came into court again about half-past eleven, when they informed the court they had not agreed. They were desired to retire again, which they did, and re-

ly; power to make a law which shall render it criminal to offer a bribe to the commissioner of the revenue, (the case before the court.) but not having done so, the crime is not recognized by the federal code, and consequently it is not a subject on which the judicial authority of the Union can operate. Mr. Dallas cited but three cases, which are probably all that had at that time been decided; the case of Henfield, who had been punished expressly for a violation of a treaty; that of Ravara, which he endeavoured to weaken; and that of Com. v. Schaffer, decided in the mayor's court of Philadelphia (4 Dal. [4 U. S.] App. 26) where it was held that, although all powers which are essential to the independence, protection or defence of the government, ought to be considered as granted by the constitution, yet where it is found that congress has not by any act legislated on a point, and thereby divested a state of a jurisdiction which, at the time, it constitutionally possessed, such jurisdiction continues in the state courts. The court were divided in their opinions, Chase, Circuit Judge, holding that there could be no indictment under the constitution for a common law offence, and Peters, District Judge, maintaining the contrary doctrine.

"In the following year (1799), at a circuit court in Connecticut, the defendant was indicted for accepting a commission from the French Republic, and cruising against and capturing British property. No question of jurisdiction was raised, and he was convicted, it being held that he could not expatriate himself. See Williams' Case [Case No. 17,708]. Shortly afterwards, Judge Washington seems to have held that there could be no indictment for perjury at common law in the courts of the United States (see Anon. [Id. 475], the report of which case appears to be defective in the conclusion of Judge Washington's opinion); and Chief Justice Marshall (U. S. v. Burr [Case No. 14,693]) hints that he too is of the opinion that no common law offence, not specified by statute, is indictable in the federal courts; and such certainly is the assumption on which he reasons in more than one succeeding case (U. S. v. Bevans, 3 Wheat. [16 U. S.] 336; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 76). But in a case which occurred in the circuit court of Massachusetts,—U. S. v. Coolidge [Case No. 14,-857],—on an indictment for an offence committed on the high seas, the question arose, directly, whether the circuit court had jurisdiction to punish offences against the United States, which had not been defined, and to which no punishment had been affixed. The judge, admitting that the courts of the United States were of limited jurisdiction, and could exercise no authority not expressly granted to them, contended, that when an authority was once lawfully given, the nature and extent of that authority, and the mode in which it should be exercised, must be regulated by the rules of the common law, and that, if this distinction was made, it would dissipate the whole difficulty and obscurity of the subject. Congress, he said, might, under the constitution, confide to the circuit courts jurisdiction of all offences against the United States, and they had conferred on them jurisdiction of almost all; that by the judiciary act the circuit courts have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where that or another statute of the United States otherwise provides; that, in order to ascertain what are crimes and offences against the United

ed States, recourse must be had to the common law, taken in connection with the constitution; and that congress has provided for the punishment of many crimes which it has not defined, an explanation and definition of which can only be found in the common law. The inference, he urged, was plain, that the circuit courts have cognizance of all offences against the United States; that what these offences were depended upon the common law, applied to the powers confided to the United States: that the circuit courts, having such cognizance, might punish by fine and imprisonment where no punishment was specially provided by statute; that the admiralty was a court of extensive criminal, as well as civil, jurisdiction; and that offences of admiralty were exclusively cognizable by the United States, and punishable by fine and imprisonment, where no other punishment was specially prescribed. The district judge dissenting, the case came before the supreme court of the United States; and it is evident, from the reported case,—[U. S. v. Coolidge] 1 Wheat. [14 U. S.] 415,—that a strong desire existed in the minds of the judges to hear the whole question of the extent of jurisdiction re-argued. The attorney general, however, declining to do so, being unwilling to attempt to shake U. S. v. Hudson, 7 Cranch [11 U. S.] 32, by the authority of that case the court felt themselves bound, and so certified to the circuit court. Chancellor Kent does not seem to think that the case of U. S. v. Coolidge [supra] should be governed by the same principle as those of U. S. v. Hudson and U. S. v. Worrall [supra], the one a libel and the other an attempt to bribe a commissioner of the revenue, the two latter being decided on the ground that the constitution had given to the courts no jurisdiction in such cases; whereas, the Case of Coolidge was one of admiralty, over which the federal courts seem to have a general and exclusive jurisdiction." Kent, Comm. p. 338; Whart. Cr. Law, p. 40. See, also, Rawle, Const. 258; Serg. Const. 272.

But even assuming that the doctrine that the common law, as a source of jurisdiction, does not control the federal courts, is now finally established, it by no means follows that the common law, as a rule for the exercise of a jurisdiction previously given, does not apply undiminished except so far as it interferes with positive statute. Thus it may be argued, that as congress has power to "define and punish offences against the law of nations," the jurisdiction of the states is thereby divested of the particular subject matter; and that consequently as the jurisdiction exists somewhere, it exists in the federal courts, ready to be exercised through the statutory medium, when congress specifies the procedure, but when no legislation has taken place, through the agency of the common law. Marbury v. Madison, 1 Cranch [5 U. S.] 137, tends to the doctrine that the federal jurisdiction in this and kindred cases is exclusive; and such is the express ruling of Com. v. Kosloff, 5 Serg. & R. 545, where Chief Justice Tilghman refused to take cognizance of a suit respecting a consul. The pregnant inquiry pressed home in the latter case:—"To the constitution to be so construed as to exclude the jurisdiction of all inferior courts, and yet suffer the authority of the supreme court to be dormant until called into action by law," &c., gives no obscure intimation of the leaning of that wise and clear headed judge on this very point. It is not inconsistent, therefore, with the doctrine discarding the common law as an origin of ju-

turned on Monday morning, having delivered into the hands of Judge WILSON a privy verdict on Sunday morning, soon after the adjournment of the court.

One of the jurymen now expressed some doubts, which occasioned the judges separately to deliver their sentiments on the points of law adverted to in the charge on Saturday evening, each of them assenting to the same, particularly as to the change of political re-

lation in the defendant, from his having been some time absent from home previous to his entering on board the privateer.

The jury again retired, and the court adjourned. At half-past four the court was convened, and the jury presented a written verdict, which the court refused to receive, as being neither general nor special. Another adjournment took place, and about seven o'clock a verdict of "Not Guilty" was delivered.[7]

---

risdiction to the federal courts, to hold that where an express subject matter is ceded to the federal government by the constitution, that subject matter is to be acted upon through the medium of common law forms. This distinction is dwelt upon by the late Mr. Duponceau in his notice of this very case.

"Judge Wilson, who presided at this trial, in his charge to the jury, took the ground of its being also an offence at common law, of which the law of nations was a part, and maintained the doctrine that the common law was to be looked to for the definition and punishment of the offence. This ground had not been adverted to in argument, or, at least, very slightly. But it would seem that the common law considered as a municipal system had nothing to do with this case. The law of nations, being the common law of the civilized world, may be said, indeed, to be a part of the law of every civilized nation; but it stands on other and higher grounds than municipal customs, statutes, edicts, or ordinances. It is binding on every people and on every government. It is to be carried into effect at all times under the penalty of being thrown out of the pale of civilization, or involving the country into a war. Every branch of the national administration, each within its district and its particular jurisdiction, is bound to administer it. It defines offences and affixes punishments, and acts everywhere proprio rigore, whenever it is not altered or modified by particular national statutes, or usages not inconsistent with its great and fundamental principles. Whether there is or not a national common law in other respects this universal common law can never cease to be the rule of executive and judicial proceedings until mankind shall return to the savage state. Judge Wilson, therefore, in my opinion, rather weakened than strengthened the ground of the prosecution in placing the law of nations on the same footing with the municipal or local common law and deriving its authority exclusively from the latter. It was considering the subject in its narrowest point of view." Dup. Jur. 3. A distinction of a parallel character is taken by Mr. Dallas, in his speech in Worrall's Case [supra], which will be presently given, where he argues that in the case in the text the defendant was indicted for an infraction of a treaty, which is the supreme law of the land, and that consequently that case is no authority for the position that at common law alone any offence against the sovereignty of the United States is indictable.

There are, however, great difficulties in the way of giving the federal courts criminal jurisdictions over infractions of treaties, or of the law of nations, and at the same time refusing them such jurisdiction over common law offences. If the common law is inadmissible to execute the jurisdiction in the latter case, the question is a critical one, whether the former can be taken in to help out the jurisdiction of the latter; and such, in fact, appears to have been the view of Judge Wilson, who, declining to place the case on the narrow ground of the law of nations alone, declared the offence to be cognizable at common law. Supposing, therefore, that Henfield's Case is in such direct conflict with U. S. v. Coolidge, and U. S. v. Hudson [supra], that either the former or the two latter must

fall, the question arises, which is to be considered as law?

Henfield's Case, it is true, was not reviewed by the court in banc, but the ruling of the court at the trial was made after a full and ample discussion by counsel distinguished for their learning and sagacity, and received the assent both of Judge Peters, the district judge, and of all the judges of the supreme court but one. Chief Justice Jay, to whom as a constitutional lawyer, no one can be pronounced superior, and to whom of all the judges who ever sat on that bench the character of a cotemporaneous expositor most properly belongs, announces the jurisdiction in advance with great solemnity, in a charge which exhibits grave deliberation. Judge Wilson and Judge Iredell, both of whom sat in the constitutional convention, proclaimed the same doctrine at the trial. The prosecution was instituted by Mr. Edmund Randolph, certainly not one of that class which leaned to an enlarged view of the judicial power, and his official opinion as attorney general was given beforehand that the offence was one which the federal courts have power to punish. Mr. Jefferson, almost at the same moment, in substance directs Mr. Morris to explain to the British court that the acquittal arose not from a want of power to punish, but a doubt in the minds of the jury as to the guilty intent; (see next note) and Chief Justice Marshall many years afterwards, laments over the verdict of the jury, not as the necessary result of a lack of jurisdiction but as a melancholy exhibition of party zeal. Id. By none of these is there the least intimation of a doubt as to the jurisdiction of the court; and when the character of the men themselves is recollected—the sound, wary, experienced judgment of Chief Justice Jay—the singular sagacity of Mr. Jefferson in every branch of our system, and his peculiar sensitiveness to judicial encroachments—and the excellent capacity and long experience of Judge Iredell, Judge Wilson, and Judge Peters—it cannot now be said that the jurisdiction was assumed inconsiderately or acquiesced in blindly. It undoubtedly was exercised because the united opinion of the day required its exercise. It was exercised in conformity with the opinion announced by Washington in his proclamation of neutrality—a paper unanimously adopted by the cabinet, as a correct exposition to foreign states of the power of the federal government—that the federal government in such cases could through its courts punish the offender. 10 Wash. Writ. by Sparks, 535, ante, p. 53. How far this opinion is to be considered as shaken in U. S. v. Hudson, where the proceedings were ex parte, and U. S. v. Coolidge, where the attorney general abandoned the question, is yet to be determined.

[7] Chief Justice Marshall (Life of Washington, vol. 2, pp. 273, 274) thus notices the result: "The administration received additional evidence of the difficulty that would attend an adherence to the system which had been commenced in the acquittal of Gideon Henfield. A prosecution had been instituted against this person, who had enlisted in Charleston on board a French privateer equipped in that port, which had brought her prizes into the port of Philadelphia. This prosecution had been directed under the ad-

[1] [Reprinted from 2 N. B. R. 546 (Quarto, 167), by permission.]

vice of the attorney general, who was of opinion that persons of this description were punishable for having violated subsisting treaties, which by the constitution are the supreme law of the land, and that they were also indictable at common law, for disturbing the peace of the United States. It could not be expected that the Democratic party would be inattentive to an act so susceptible of misrepresentation. Their papers sounded the alarm, and it was universally asked, 'What law had been offended, and under what statute was the indictment supported? Were the American people already prepared to give to a proclamation the force of a legislative act, and to subject themselves to the will of the executive? But if they were already sunk to such a state of degradation, were they to be punished for violating a proclamation which had not been published when the offence was committed, if indeed it could be termed an offence to engage with France, combating for liberty against the combined despots of Europe.' " "As the trial approached, a great degree of sensibility was displayed, and the verdict in favour of Henfield was celebrated with extravagant marks of joy and exultation. It bereaved the executive of the strength to be derived from an opinion, that punishment might be legally inflicted on those who should openly violate the rules prescribed for the preservation of neutrality; and exposed that department to the obloquy of having attempted a measure which the laws would not justify." The verdict was considered by Washington of such moment, as to lead him to enumerate it as a principal reason to be considered in the question of calling an extra session of congress, respecting which he asked the opinion of his cabinet on August 3, 1793. See 10 Wash. Writ. by Sparks, 362.

In a letter from Mr. Jefferson to Mr. Morris, then in England (3 Jeff. Cor. 271), it is said: "It has been pretended, indeed, that the engagement of a citizen in an enterprise of this nature, was a divestment of the character of citizen, and a transfer of jurisdiction over him to another sovereign. Our citizens are entirely free to divest themselves of that character by emigration, and other acts manifesting their intention, and may then become the subjects of another power, and free to do whatever the subjects of that power may do. But the laws do not admit that the bare commission of a crime amounts of itself to a divestment of the character of citizen, and withdraws the criminal from their coercion. They would never prescribe an illegal act among the legal modes by which a citizen must disfranchise himself; nor render treason, for instance, innocent, by giving it the force of a dissolution of the obligation of the criminal to his country. Accordingly, in the case of Henfield, a citizen of these states, charged with having engaged, in the port of Charleston, in an enterprise against nations at peace with us, and having joined in the actual commission of hostilities, the attorney general of the United States, in an official opinion, declared that the act with which he was charged was punishable by law. The same thing has been unanimously declared by two of the circuit courts of the United States, as you will see in the charges of Chief Justice Jay, delivered at Richmond, and Judge Wilson, delivered at Philadelphia: both of which are herewith sent. Yet Mr. Genet, in the moment he lands at Charleston, is able to tell the governor, and continues to affirm in his correspondence there, that no law of the United States authorizes their government to restrain either its own citizens or the foreigners inhabiting its territory, from warring against the enemies of France. It is true, indeed, that in the Case of Henfield, the jury which tried, absolved him. But it appeared on the trial, that the crime was not knowingly and wilfully committed; that Henfield was ignorant of the unlawfulness of his undertaking; that, in the moment he was apprized of it he showed real contrition; that he had rendered meritorious services during the late war, and declared that he would live and die an American. The jury, therefore, in absolving him, did no more than the constitutional authority might have done, had they found him guilty; the constitution having provided for the pardon of certain offences in certain cases, and there being no case where it could have been more proper than where no offence was contemplated. Henfield, therefore, was still an American citizen, and Mr. Genet's reclamation of him was as unauthorized as the first enlistment of him." See, generally, Wait, St. Pap. 85, 86, 143.

Mr. Genet's proceedings during the trial were marked with his usual turbulence. Starting with the inception of the prosecution, he addresses the secretary of state as follows: "I have this moment been informed that two officers in the service of the Republic of France, citizens Gideon Henfield and John Singletary, have been arrested on board the privateer of the French Republic, the Citizen Genet, and conducted to prison. The crime, laid to their charge—the crime which my mind cannot conceive, and which my pen almost refuses to state —is the serving of France, and defending with her children the common glorious cause of liberty. Being ignorant of any positive law which deprives Americans of this privilege, and authorizes officers of police arbitrarily to take mariners in the service of France from on board their vessels, I call upon your intervention, sir, and that of the president of the United States, in order to obtain the immediate releasement of the above mentioned officers, who have acquired by the sentiments animating them, and by the act of their engagement, anterior to every act to the contrary, the right of French citizens if they have lost that of American citizens." Keeping even pace with the prosecution, at every fresh step taken by it he sends in a fresh protest; and immediately on the rendition of the verdict, issues cards to a dinner party "to meet Citizen Henfield;" following up this last stroke by announcing that "the citizen" had been formally taken under the protection of the French Republic. Unfortunately, however, for Henfield, this "protection" was not very potent, for, elated with the honour of French citizenship, he sallied forth in a new excursion, which resulted in his capture by a British cruiser.